VILLAGE OF ARLINGTON HEIGHTS ET AL. *v.* METRO-
POLITAN HOUSING DEVELOPMENT CORP. ET AL.

No. 75–616.   Argued October 13, 1976—Decided January 11, 1977

*Jack M. Siegel* argued the cause and filed briefs for petitioners.

*F. Willis Caruso* argued the cause for respondents. With him on the briefs were *Carol M. Petersen* and *Robert G. Schwemm.**

MR. JUSTICE POWELL delivered the opinion of the Court.

In 1971 respondent Metropolitan Housing Development Corporation (MHDC) applied to petitioner, the Village of Arlington Heights, Ill., for the rezoning of a 15-acre parcel from single-family to multiple-family classification. Using federal financial assistance, MHDC planned to build 190 clustered townhouse units for low- and moderate-income tenants. The Village denied the rezoning request. MHDC, joined by other plaintiffs who are also respondents here, brought suit in the United States District Court for the Northern District of Illinois.[1] They alleged that the denial was racially discriminatory and that it violated, *inter alia,* the Fourteenth Amendment and the Fair Housing Act of 1968, 82 Stat. 81, 42 U. S. C. § 3601 *et seq.* Following a bench trial, the District Court entered judgment for the Village, 373 F. Supp. 208 (1974), and respondents appealed. The Court of Appeals for the Seventh Circuit reversed, finding that the "ultimate effect" of the denial was racially discriminatory, and that the refusal to rezone therefore violated the Fourteenth Amendment. 517 F. 2d 409 (1975). We granted

---

*Briefs of *amici curiae* urging affirmance were filed by *Conrad N. Bagne* for the American Society of Planning Officials, and by *Abe Fortas* and *Stephen C. Shamberg* for the League of Women Voters of the United States et al.

[1] Respondents named as defendants both the Village and a number of its officials, sued in their official capacity. The latter were the Mayor, the Village Manager, the Director of Building and Zoning, and the entire Village Board of Trustees. For convenience, we will occasionally refer to all the petitioners collectively as "the Village."

the Village's petition for certiorari, 423 U. S. 1030 (1975), and now reverse.

## I

Arlington Heights is a suburb of Chicago, located about 26 miles northwest of the downtown Loop area. Most of the land in Arlington Heights is zoned for detached single-family homes, and this is in fact the prevailing land use. The Village experienced substantial growth during the 1960's, but, like other communities in northwest Cook County, its population of racial minority groups remained quite low. According to the 1970 census, only 27 of the Village's 64,000 residents were black.

The Clerics of St. Viator, a religious order (Order), own an 80-acre parcel just east of the center of Arlington Heights. Part of the site is occupied by the Viatorian high school, and part by the Order's three-story novitiate building, which houses dormitories and a Montessori school. Much of the site, however, remains vacant. Since 1959, when the Village first adopted a zoning ordinance, all the land surrounding the Viatorian property has been zoned R–3, a single-family specification with relatively small minimum lot-size requirements. On three sides of the Viatorian land there are single-family homes just across a street; to the east the Viatorian property directly adjoins the backyards of other single-family homes.

The Order decided in 1970 to devote some of its land to low- and moderate-income housing. Investigation revealed that the most expeditious way to build such housing was to work through a nonprofit developer experienced in the use of federal housing subsidies under § 236 of the National Housing Act, 48 Stat. 1246, as added and amended, 12 U. S. C. § 1715z–1.[2]

---

[2] Section 236 provides for "interest reduction payments" to owners of rental housing projects which meet the Act's requirements, if the savings are passed on to the tenants in accordance with a rather complex formula. Qualifying owners effectively pay 1% interest on money borrowed to

MHDC is such a developer. It was organized in 1968 by several prominent Chicago citizens for the purpose of building low- and moderate-income housing throughout the Chicago area. In 1970 MHDC was in the process of building one § 236 development near Arlington Heights and already had provided some federally assisted housing on a smaller scale in other parts of the Chicago area.

After some negotiation, MHDC and the Order entered into a 99-year lease and an accompanying agreement of sale covering a 15-acre site in the southeast corner of the Viatorian property. MHDC became the lessee immediately, but the sale agreement was contingent upon MHDC's securing zoning clearances from the Village and § 236 housing assistance from the Federal Government. If MHDC proved unsuccessful in securing either, both the lease and the contract of sale would lapse. The agreement established a bargain purchase price of $300,000, low enough to comply with federal limitations governing land-acquisition costs for § 236 housing.

MHDC engaged an architect and proceeded with the proj-

---

construct, rehabilitate, or purchase their properties. (Section 236 has been amended frequently in minor respects since this litigation began. See 12 U. S. C. § 1715z-1 (1970 ed., Supp. V), and the Housing Authorization Act of 1976, § 4, 90 Stat. 1070.)

New commitments under § 236 were suspended in 1973 by executive decision, and they have not been revived. Projects which formerly could claim § 236 assistance, however, will now generally be eligible for aid under § 8 of the United States Housing Act of 1937, as amended by § 201 (a) of the Housing and Community Development Act of 1974, 42 U. S. C. § 1437f (1970 ed., Supp. V), and by the Housing Authorization Act of 1976, § 2, 90 Stat. 1068. Under the § 8 program, the Department of Housing and Urban Development contracts to pay the owner of the housing units a sum which will make up the difference between a fair market rent for the area and the amount contributed by the low-income tenant. The eligible tenant family pays between 15% and 25% of its gross income for rent. Respondents indicated at oral argument that, despite the demise of the § 236 program, construction of the MHDC project could proceed under § 8 if zoning clearance is now granted.

ect, to be known as Lincoln Green. The plans called for 20 two-story buildings with a total of 190 units, each unit having its own private entrance from the outside. One hundred of the units would have a single bedroom, thought likely to attract elderly citizens. The remainder would have two, three, or four bedrooms. A large portion of the site would remain open, with shrubs and trees to screen the homes abutting the property to the east.

The planned development did not conform to the Village's zoning ordinance and could not be built unless Arlington Heights rezoned the parcel to R–5, its multiple-family housing classification. Accordingly, MHDC filed with the Village Plan Commission a petition for rezoning, accompanied by supporting materials describing the development and specifying that it would be subsidized under § 236. The materials made clear that one requirement under § 236 is an affirmative marketing plan designed to assure that a subsidized development is racially integrated. MHDC also submitted studies demonstrating the need for housing of this type and analyzing the probable impact of the development. To prepare for the hearings before the Plan Commission and to assure compliance with the Village building code, fire regulations, and related requirements, MHDC consulted with the Village staff for preliminary review of the development. The parties have stipulated that every change recommended during such consultations was incorporated into the plans.

During the spring of 1971, the Plan Commission considered the proposal at a series of three public meetings, which drew large crowds. Although many of those attending were quite vocal and demonstrative in opposition to Lincoln Green, a number of individuals and representatives of community groups spoke in support of rezoning. Some of the comments, both from opponents and supporters, addressed what was referred to as the "social issue"—the desirability or undesirability of introducing at this location in Arlington Heights

low- and moderate-income housing, housing that would probably be racially integrated.

Many of the opponents, however, focused on the zoning aspects of the petition, stressing two arguments. First, the area always had been zoned single-family, and the neighboring citizens had built or purchased there in reliance on that classification. Rezoning threatened to cause a measurable drop in property value for neighboring sites. Second, the Village's apartment policy, adopted by the Village Board in 1962 and amended in 1970, called for R–5 zoning primarily to serve as a buffer between single-family development and land uses thought incompatible, such as commercial or manufacturing districts. Lincoln Green did not meet this requirement, as it adjoined no commercial or manufacturing district.

At the close of the third meeting, the Plan Commission adopted a motion to recommend to the Village's Board of Trustees that it deny the request. The motion stated: "While the need for low and moderate income housing may exist in Arlington Heights or its environs, the Plan Commission would be derelict in recommending it at the proposed location." Two members voted against the motion and submitted a minority report, stressing that in their view the change to accommodate Lincoln Green represented "good zoning." The Village Board met on September 28, 1971, to consider MHDC's request and the recommendation of the Plan Commission. After a public hearing, the Board denied the rezoning by a 6–1 vote.

The following June MHDC and three Negro individuals filed this lawsuit against the Village, seeking declaratory and injunctive relief.[3] A second nonprofit corporation and an individual of Mexican-American descent intervened as plain-

---

[3] The individual plaintiffs sought certification of the action as a class action pursuant to Fed. Rule Civ. Proc. 23 but the District Court declined to certify. 373 F. Supp. 208, 209 (1974).

tiffs. The trial resulted in a judgment for petitioners. Assuming that MHDC had standing to bring the suit,[4] the District Court held that the petitioners were not motivated by racial discrimination or intent to discriminate against low-income groups when they denied rezoning, but rather by a desire "to protect property values and the integrity of the Village's zoning plan." 373 F. Supp., at 211. The District Court concluded also that the denial would not have a racially discriminatory effect.

A divided Court of Appeals reversed. It first approved the District Court's finding that the defendants were motivated by a concern for the integrity of the zoning plan, rather than by racial discrimination. Deciding whether their refusal to rezone would have discriminatory effects was more complex. The court observed that the refusal would have a disproportionate impact on blacks. Based upon family income, blacks constituted 40% of those Chicago area residents who were eligible to become tenants of Lincoln Green, although they composed a far lower percentage of total area population. The court reasoned, however, that under our decision in *James* v. *Valtierra,* 402 U. S. 137 (1971), such a disparity in racial impact alone does not call for strict scrutiny of a municipality's decision that prevents the construction of the low-cost housing.[5]

There was another level to the court's analysis of allegedly discriminatory results. Invoking language from *Kennedy Park Homes Assn.* v. *City of Lackawanna,* 436 F. 2d 108,

---

[4] A different District Judge had heard early motions in the case. He had sustained the complaint against a motion to dismiss for lack of standing, and the judge who finally decided the case said he found "no need to reexamine [the predecessor judge's] conclusions" in this respect. *Ibid.*

[5] Nor is there reason to subject the Village's action to more stringent review simply because it involves respondents' interest in securing housing. *Lindsey* v. *Normet,* 405 U. S. 56, 73–74 (1972). See generally *San Antonio School Dist.* v. *Rodriguez,* 411 U. S. 1, 18–39 (1973).

112 (CA2 1970), cert. denied, 401 U. S. 1010 (1971), the Court of Appeals ruled that the denial of rezoning must be examined in light of its "historical context and ultimate effect."[6]   517 F. 2d, at 413.   Northwest Cook County was enjoying rapid growth in employment opportunities and population, but it continued to exhibit a high degree of residential segregation.   The court held that Arlington Heights could not simply ignore this problem.   Indeed, it found that the Village had been "exploiting" the situation by allowing itself to become a nearly all-white community.   *Id.,* at 414.   The Village had no other current plans for building low- and moderate-income housing, and no other R–5 parcels in the Village were available to MHDC at an economically feasible price.

Against this background, the Court of Appeals ruled that the denial of the Lincoln Green proposal had racially discriminatory effects and could be tolerated only if it served compelling interests.   Neither the buffer policy nor the desire to protect property values met this exacting standard.   The court therefore concluded that the denial violated the Equal Protection Clause of the Fourteenth Amendment.

## II

At the outset, petitioners challenge the respondents' standing to bring the suit.   It is not clear that this challenge was pressed in the Court of Appeals, but since our jurisdiction to decide the case is implicated, *Jenkins* v. *McKeithen,* 395 U. S. 411, 421 (1969) (plurality opinion), we shall consider it.

In *Warth* v. *Seldin,* 422 U. S. 490 (1975), a case similar in some respects to this one, we reviewed the constitutional limitations and prudential considerations that guide a court in determining a party's standing, and we need not repeat that discussion here.   The essence of the standing question,

---

[6] This language apparently derived from our decision in *Reitman* v. *Mulkey,* 387 U. S. 369, 373 (1967) (quoting from the opinion of the California Supreme Court in the case then under review).

in its constitutional dimension, is "whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Id.,* at 498–499, quoting *Baker* v. *Carr,* 369 U. S. 186, 204 (1962). The plaintiff must show that he himself is injured by the challenged action of the defendant. The injury may be indirect, see *United States* v. *SCRAP,* 412 U. S. 669, 688 (1973), but the complaint must indicate that the injury is indeed fairly traceable to the defendant's acts or omissions. *Simon* v. *Eastern Ky. Welfare Rights Org.,* 426 U. S. 26, 41–42 (1976); *O'Shea* v. *Littleton,* 414 U. S. 488, 498 (1974); *Linda R. S.* v. *Richard D.,* 410 U. S. 614, 617 (1973).

## A

Here there can be little doubt that MHDC meets the constitutional standing requirements. The challenged action of the petitioners stands as an absolute barrier to constructing the housing MHDC had contracted to place on the Viatorian site. If MHDC secures the injunctive relief it seeks, that barrier will be removed. An injunction would not, of course, guarantee that Lincoln Green will be built. MHDC would still have to secure financing, qualify for federal subsidies,[7] and carry through with construction. But all housing developments are subject to some extent to similar uncertainties. When a project is as detailed and specific as Lincoln Green, a court is not required to engage in undue speculation

---

[7] Petitioners suggest that the suspension of the § 236 housing-assistance program makes it impossible for MHDC to carry out its proposed project and therefore deprives MHDC of standing. The District Court also expressed doubts about MHDC's position in the case in light of the suspension. 373 F. Supp., at 211. Whether termination of all available assistance programs would preclude standing is not a matter we need to decide, in view of the current likelihood that subsidies may be secured under § 8 of the United States Housing Act of 1937, as amended by the Housing and Community Development Act of 1974. See n. 2, *supra.*

as a predicate for finding that the plaintiff has the requisite personal stake in the controversy. MHDC has shown an injury to itself that is "likely to be redressed by a favorable decision." *Simon* v. *Eastern Ky. Welfare Rights Org., supra,* at 38.

Petitioners nonethless appear to argue that MHDC lacks standing because it has suffered no economic injury. MHDC, they point out, is not the owner of the property in question. Its contract of purchase is contingent upon securing rezoning.[8] MHDC owes the owners nothing if rezoning is denied.

We cannot accept petitioners' argument. In the first place, it is inaccurate to say that MHDC suffers no economic injury from a refusal to rezone, despite the contingency provisions in its contract. MHDC has expended thousands of dollars on the plans for Lincoln Green and on the studies submitted to the Village in support of the petition for rezoning. Unless rezoning is granted, many of these plans and studies will be worthless even if MHDC finds another site at an equally attractive price.

Petitioners' argument also misconceives our standing requirements. It has long been clear that economic injury is not the only kind of injury that can support a plain-

---

[8] Petitioners contend that MHDC lacks standing to pursue its claim here because a contract purchaser whose contract is contingent upon rezoning cannot contest a zoning decision in the Illinois courts. Under the law of Illinois, only the owner of the property has standing to pursue such an action. *Clark Oil & Refining Corp.* v. *City of Evanston,* 23 Ill. 2d 48, 177 N. E. 2d 191 (1961); but see *Solomon* v. *City of Evanston,* 29 Ill. App. 3d 782, 331 N. E. 2d 380 (1975).

State law of standing, however, does not govern such determinations in the federal courts. The constitutional and prudential considerations canvassed at length in *Warth* v. *Seldin,* 422 U. S. 490 (1975), respond to concerns that are peculiarly federal in nature. Illinois may choose to close its courts to applicants for rezoning unless they have an interest more direct than MHDC's, but this choice does not necessarily disqualify MHDC from seeking relief in federal courts for an asserted injury to its federal rights.

tiff's standing. *United States* v. *SCRAP, supra,* at 686–687; *Sierra Club* v. *Morton,* 405 U. S. 727, 734 (1972); *Data Processing Service* v. *Camp,* 397 U. S. 150, 154 (1970). MHDC is a nonprofit corporation. Its interest in building Lincoln Green stems not from a desire for economic gain, but rather from an interest in making suitable low-cost housing available in areas where such housing is scarce. This is not mere abstract concern about a problem of general interest. See *Sierra Club* v. *Morton, supra,* at 739. The specific project MHDC intends to build, whether or not it will generate profits, provides that "essential dimension of specificity" that informs judicial decisionmaking. *Schlesinger* v. *Reservists to Stop the War,* 418 U. S. 208, 221 (1974).

## B

Clearly MHDC has met the constitutional requirements, and it therefore has standing to assert its own rights. Foremost among them is MHDC's right to be free of arbitrary or irrational zoning actions. See *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365 (1926); *Nectow* v. *City of Cambridge,* 277 U. S. 183 (1928); *Village of Belle Terre* v. *Boraas,* 416 U. S. 1 (1974). But the heart of this litigation has never been the claim that the Village's decision fails the generous *Euclid* test, recently reaffirmed in *Belle Terre.* Instead it has been the claim that the Village's refusal to rezone discriminates against racial minorities in violation of the Fourteenth Amendment. As a corporation, MHDC has no racial identity and cannot be the direct target of the petitioners' alleged discrimination. In the ordinary case, a party is denied standing to assert the rights of third persons. *Warth* v. *Seldin,* 422 U. S., at 499. But we need not decide whether the circumstances of this case would justify departure from that prudential limitation and permit MHDC to assert the constitutional rights of its prospective minority tenants. See *Barrows* v. *Jackson,* 346 U. S. 249 (1953); cf. *Sullivan* v.

*Little Hunting Park,* 396 U. S. 229, 237 (1969); *Buchanan* v. *Warley,* 245 U. S. 60, 72–73 (1917). For we have at least one individual plaintiff who has demonstrated standing to assert these rights as his own.[9]

Respondent Ransom, a Negro, works at the Honeywell factory in Arlington Heights and lives approximately 20 miles away in Evanston in a 5-room house with his mother and his son. The complaint alleged that he seeks and would qualify for the housing MHDC wants to build in Arlington Heights. Ransom testified at trial that if Lincoln Green were built he would probably move there, since it is closer to his job.

The injury Ransom asserts is that his quest for housing nearer his employment has been thwarted by official action that is racially discriminatory. If a court grants the relief he seeks, there is at least a "substantial probability," *Warth* v. *Seldin, supra,* at 504, that the Lincoln Green project will materialize, affording Ransom the housing opportunity he desires in Arlington Heights. His is not a generalized grievance. Instead, as we suggested in *Warth, supra,* at 507, 508 n. 18, it focuses on a particular project and is not dependent on speculation about the possible actions of third parties not before the court. See *id.,* at 505; *Simon* v. *Eastern Ky. Welfare Rights Org.,* 426 U. S., at 41–42. Unlike the individual plaintiffs in *Warth,* Ransom has adequately averred an "actionable causal relationship" between Arlington Heights' zoning practices and his asserted injury. *Warth* v. *Seldin, supra,* at 507. We therefore proceed to the merits.

## III

Our decision last Term in *Washington* v. *Davis,* 426 U. S. 229 (1976), made it clear that official action will not be held

---

[9] Because of the presence of this plaintiff, we need not consider whether the other individual and corporate plaintiffs have standing to maintain the suit.

unconstitutional solely because it results in a racially disproportionate impact. "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." *Id.*, at 242. Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. Although some contrary indications may be drawn from some of our cases,[10] the holding in *Davis* reaffirmed a principle well established in a variety of contexts. *E. g., Keyes* v. *School Dist. No. 1, Denver, Colo.,* 413 U. S. 189, 208 (1973) (schools); *Wright* v. *Rockefeller,* 376 U. S. 52, 56–57 (1964) (election districting); *Akins* v. *Texas,* 325 U. S. 398, 403–404 (1945) (jury selection).

*Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one.[11] In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a proof that a discriminatory pur-

---

[10] *Palmer* v. *Thompson,* 403 U. S. 217, 225 (1971); *Wright* v. *Council of City of Emporia,* 407 U. S. 451, 461–462 (1972); cf. *United States* v. *O'Brien,* 391 U. S. 367, 381–386 (1968). See discussion in *Washington* v. *Davis,* 426 U. S., at 242–244.

[11] In *McGinnis* v. *Royster,* 410 U. S. 263, 276–277 (1973), in a somewhat different context, we observed:

"The search for legislative purpose is often elusive enough, *Palmer* v. *Thompson,* 403 U. S. 217 (1971), without a requirement that primacy be ascertained. Legislation is frequently multipurposed: the removal of even a 'subordinate' purpose may shift altogether the consensus of legislative judgment supporting the statute."

pose has been a motivating factor in the decision, this judicial deference is no longer justified.[12]

Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available. The impact of the official action—whether it "bears more heavily on one race than another," *Washington* v. *Davis, supra,* at 242—may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face. *Yick Wo* v. *Hopkins,* 118 U. S. 356 (1886); *Guinn* v. *United States,* 238 U. S. 347 (1915); *Lane* v. *Wilson,* 307 U. S. 268 (1939); *Gomillion* v. *Lightfoot,* 364 U. S. 339 (1960). The evidentiary inquiry is then relatively easy.[13] But such cases are rare. Absent a pattern as stark as that in *Gomillion* or *Yick Wo,* impact alone is not determinative,[14] and the Court must look to other evidence.[15]

---

[12] For a scholarly discussion of legislative motivation, see Brest, *Palmer v. Thompson: An Approach to the Problem of Unconstitutional Legislative Motive,* 1971 Sup. Ct. Rev. 95, 116–118.

[13] Several of our jury-selection cases fall into this category. Because of the nature of the jury-selection task, however, we have permitted a finding of constitutional violation even when the statistical pattern does not approach the extremes of *Yick Wo* or *Gomillion.* See, *e. g., Turner v. Fouche,* 396 U. S. 346, 359 (1970); *Sims v. Georgia,* 389 U. S. 404, 407 (1967).

[14] This is not to say that a consistent pattern of official racial discrimination is a necessary predicate to a violation of the Equal Protection Clause. A single invidiously discriminatory governmental act—in the exercise of the zoning power as elsewhere—would not necessarily be immunized by the absence of such discrimination in the making of other comparable decisions. See *City of Richmond v. United States,* 422 U. S. 358, 378 (1975).

[15] In many instances, to recognize the limited probative value of disproportionate impact is merely to acknowledge the "heterogeneity" of the Nation's population. *Jefferson v. Hackney,* 406 U. S. 535, 548 (1972); see also *Washington v. Davis, supra,* at 248.

The historical background of the decision is one evidentiary source, particularly if it reveals a series of official actions taken for invidious purposes. See *Lane* v. *Wilson, supra; Griffin* v. *School Board,* 377 U. S. 218 (1964); *Davis* v. *Schnell,* 81 F. Supp. 872 (SD Ala.), aff'd *per curiam,* 336 U. S. 933 (1949); cf. *Keyes* v. *School Dist. No. 1, Denver Colo., supra,* at 207. The specific sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes. *Reitman* v. *Mulkey,* 387 U. S. 369, 373–376 (1967); *Grosjean* v. *American Press Co.,* 297 U. S. 233, 250 (1936). For example, if the property involved here always had been zoned R–5 but suddenly was changed to R–3 when the town learned of MHDC's plans to erect integrated housing,[16] we would have a far different case. Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role. Substantive departures too may be relevant, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached.[17]

---

[16] See, *e. g., Progress Development Corp.* v. *Mitchell,* 286 F. 2d 222 (CA7 1961) (park board allegedly condemned plaintiffs' land for a park upon learning that the homes plaintiffs were erecting there would be sold under a marketing plan designed to assure integration); *Kennedy Park Homes Assn.* v. *City of Lackawanna,* 436 F. 2d 108 (CA2 1970), cert. denied, 401 U. S. 1010 (1971) (town declared moratorium on new subdivisions and rezoned area for parkland shortly after learning of plaintiffs' plans to build low-income housing). To the extent that the decision in *Kennedy Park Homes* rested solely on a finding of discriminatory impact, we have indicated our disagreement. *Washington* v. *Davis, supra,* at 244–245.

[17] See *Dailey* v. *City of Lawton,* 425 F. 2d 1037 (CA10 1970). The plaintiffs in *Dailey* planned to build low-income housing on the site of a former school that they had purchased. The city refused to rezone the land from PF, its public facilities classification, to R–4, high-density residential. All the surrounding area was zoned R–4, and both the present and the former planning director for the city testified that there was no reason "from a zoning standpoint" why the land should not be

The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports. In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege. See *Tenney* v. *Brandhove*, 341 U. S. 367 (1951); *United States* v. *Nixon*, 418 U. S. 683, 705 (1974); 8 J. Wigmore, Evidence § 2371 (McNaughton rev. ed. 1961).[18]

The foregoing summary identifies, without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed. With these in mind, we now address the case before us.

## IV

This case was tried in the District Court and reviewed in the Court of Appeals before our decision in *Washington* v. *Davis, supra*. The respondents proceeded on the erroneous theory that the Village's refusal to rezone carried a racially discriminatory effect and was, without more, unconstitutional. But both courts below understood that at least part of their function was to examine the purpose underlying the decision.

---

classified R–4. Based on this and other evidence, the Court of Appeals ruled that "the record sustains the [District Court's] holding of racial motivation and of arbitrary and unreasonable action." *Id.*, at 1040.

[18] This Court has recognized, ever since *Fletcher* v. *Peck*, 6 Cranch 87, 130–131 (1810), that judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government. Placing a decisionmaker on the stand is therefore "usually to be avoided." *Citizens to Preserve Overton Park* v. *Volpe*, 401 U. S. 402, 420 (1971). The problems involved have prompted a good deal of scholarly commentary. See Tussman & tenBroek, The Equal Protection of the Laws, 37 Calif. L. Rev. 341, 356–361 (1949); A. Bickel, The Least Dangerous Branch 208–221 (1962); Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L. J. 1205 (1970); Brest, *supra*, n. 12.

In making its findings on this issue, the District Court noted that some of the opponents of Lincoln Green who spoke at the various hearings might have been motivated by opposition to minority groups. The court held, however, that the evidence "does not warrant the conclusion that this motivated the defendants." 373 F. Supp., at 211.

On appeal the Court of Appeals focused primarily on respondents' claim that the Village's buffer policy had not been consistently applied and was being invoked with a strictness here that could only demonstrate some other underlying motive. The court concluded that the buffer policy, though not always applied with perfect consistency, had on several occasions formed the basis for the Board's decision to deny other rezoning proposals. "The evidence does not necessitate a finding that Arlington Heights administered this policy in a discriminatory manner." 517. F. 2d, at 412. The Court of Appeals therefore approved the District Court's findings concerning the Village's purposes in denying rezoning to MHDC.

We also have reviewed the evidence. The impact of the Village's decision does arguably bear more heavily on racial minorities. Minorities constitute 18% of the Chicago area population, and 40% of the income groups said to be eligible for Lincoln Green. But there is little about the sequence of events leading up to the decision that would spark suspicion. The area around the Viatorian property has been zoned R–3 since 1959, the year when Arlington Heights first adopted a zoning map. Single-family homes surround the 80-acre site, and the Village is undeniably committed to single-family homes as its dominant residential land use. The rezoning request progressed according to the usual procedures.[19] The Plan Commission even scheduled two ad-

---

[19] Respondents have made much of one apparent procedural departure. The parties stipulated that the Village Planner, the staff member whose primary responsibility covered zoning and planning matters, was never

ditional hearings, at least in part to accommodate MHDC and permit it to supplement its presentation with answers to questions generated at the first hearing.

The statements by the Plan Commission and Village Board members, as reflected in the official minutes, focused almost exclusively on the zoning aspects of the MHDC petition, and the zoning factors on which they relied are not novel criteria in the Village's rezoning decisions. There is no reason to doubt that there has been reliance by some neighboring property owners on the maintenance of single-family zoning in the vicinity. The Village originally adopted its buffer policy long before MHDC entered the picture and has applied the policy too consistently for us to infer discriminatory purpose from its application in this case. Finally, MHDC called one member of the Village Board to the stand at trial. Nothing in her testimony supports an inference of invidious purpose.[20]

In sum, the evidence does not warrant overturning the concurrent findings of both courts below. Respondents simply failed to carry their burden of proving that discriminatory purpose was a motivating factor in the Village's decision.[21]

---

asked for his written or oral opinion of the rezoning request. The omission does seem curious, but respondents failed to prove at trial what role the Planner customarily played in rezoning decisions, or whether his opinion would be relevant to respondents' claims.

[20] Respondents complain that the District Court unduly limited their efforts to prove that the Village Board acted for discriminatory purposes, since it forbade questioning Board members about their motivation at the time they cast their votes. We perceive no abuse of discretion in the circumstances of this case, even if such an inquiry into motivation would otherwise have been proper. See n. 18, *supra*. Respondents were allowed, both during the discovery phase and at trial, to question Board members fully about materials and information available to them at the time of decision. In light of respondents' repeated insistence that it was effect and not motivation which would make out a constitutional violation, the District Court's action was not improper.

[21] Proof that the decision by the Village was motivated in part by a

This conclusion ends the constitutional inquiry. The Court of Appeals' further finding that the Village's decision carried a discriminatory "ultimate effect" is without independent constitutional significance.

## V

Respondents' complaint also alleged that the refusal to rezone violated the Fair Housing Act of 1968, 42 U. S. C. § 3601 *et seq.* They continue to urge here that a zoning decision made by a public body may, and that petitioners' action did, violate § 3604 or § 3617. The Court of Appeals, however, proceeding in a somewhat unorthodox fashion, did not decide the statutory question. We remand the case for further consideration of respondents' statutory claims.

*Reversed and remanded.*

MR. JUSTICE STEVENS took no part in the consideration or decision of this case.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, concurring in part and dissenting in part.

I concur in Parts I–III of the Court's opinion. However, I believe the proper result would be to remand this entire case to the Court of Appeals for further proceedings consistent with *Washington* v. *Davis,* 426 U. S. 229 (1976), and today's opinion. The Court of Appeals is better situated

racially discriminatory purpose would not necessarily have required invalidation of the challenged decision. Such proof would, however, have shifted to the Village the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered. If this were established, the complaining party in a case of this kind no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose. In such circumstances, there would be no justification for judicial interference with the challenged decision. But in this case respondents failed to make the required threshold showing. See *Mt. Healthy City Board of Ed.* v. *Doyle, post,* p. 274.

than this Court both to reassess the significance of the evidence developed below in light of the standards we have set forth and to determine whether the interests of justice require further District Court proceedings directed toward those standards.

MR. JUSTICE WHITE, dissenting.

The Court reverses the judgment of the Court of Appeals because it finds, after re-examination of the evidence supporting the concurrent findings below, that "[r]espondents ... failed to carry their burden of proving that discriminatory purpose ·was a motivating factor in the Village's decision." *Ante,* at 270. The Court reaches this result by interpreting our decision in *Washington* v. *Davis,* 426 U. S. 229 (1976), and applying it to this case, notwithstanding that the Court of Appeals rendered its decision in this case before *Washington* v. *Davis* was handed down, and thus did not have the benefit of our decision when it found a Fourteenth Amendment violation.

The Court gives no reason for its failure to follow our usual practice in this situation of vacating the judgment below and remanding in order to permit the lower court to reconsider its ruling in light of our intervening decision. The Court's articulation of a legal standard nowhere mentioned in *Davis* indicates that it feels that the application of *Davis* to these facts calls for substantial analysis. If this is true, we would do better to allow the Court of Appeals to attempt that analysis in the first instance. Given that the Court deems it necessary to re-examine the evidence in the case in light of the legal standard it adopts, a remand is especially appropriate. As the cases relied upon by the Court indicate, the primary function of this Court is not to review the evidence supporting findings of the lower courts. See, *e. g., Wright* v. *Rockefeller,* 376 U. S. 52, 56–57 (1964); *Akins* v. *Texas,* 325 U. S. 398, 402 (1945).

A further justification for remanding on the constitutional issue is that a remand is required in any event on respondents' Fair Housing Act claim, 42 U. S. C. § 3601 *et seq.,* not yet addressed by the Court of Appeals. While conceding that a remand is necessary because of the Court of Appeals' "unorthodox" approach of deciding the constitutional issue without reaching the statutory claim, *ante,* at 271, the Court refuses to allow the Court of Appeals to reconsider its constitutional holding in light of *Davis* should it become necessary to reach that issue.

Even if I were convinced that it was proper for the Court to reverse the judgment below on the basis of an intervening decision of this Court and after a re-examination of concurrent findings of fact below, I believe it is wholly unnecessary for the Court to embark on a lengthy discussion of the standard for proving the racially discriminatory purpose required by *Davis* for a Fourteenth Amendment violation. The District Court found that the Village was motivated "by a legitimate desire to protect property values and the integrity of the Village's zoning plan." The Court of Appeals accepted this finding as not clearly erroneous, and the Court quite properly refuses to overturn it on review here. There is thus no need for this Court to list various "evidentiary sources" or "subjects of proper inquiry" in determining whether a racially discriminatory purpose existed.

I would vacate the judgment of the Court of Appeals and remand the case for consideration of the statutory issue and, if necessary, for consideration of the constitutional issue in light of *Washington* v. *Davis.*