**R.I.S.E., INC., et al., Plaintiffs,**

v.

**Robert A. KAY, Jr., et al., Defendants.**

**Civ. A. No. 3:90CV000680.**

United States District Court,
E.D. Virginia,
Richmond Division.

June 21, 1991.

See also, 768 F.Supp. 1141.

Sa'ad El–Amin, Richmond, Va., for plaintiffs.

John Granville Douglass, Jonathan Steven Geldzahler, Wright, Robinson, McCammon, Osthimer & Tatum, Richmond, Va., for defendants Robert A. Kay, Jr., Robert H. Bourne, Jr., Raymond F. Alsop, Wilbur L. Hickman, and James R. Walton.

Dennis Patrick Lacy, Jr., William Jeffrey Dinkin, Clayton Lewis Walton, Timothy George Hayes, Samuel Miles Dumville, Hazel, Thomas, Fiske, Beckhorn & Hanes, Richmond, Va., for defendant Browning–Ferris Industries of South Atlantic.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

RICHARD L. WILLIAMS, District Judge.

This case is before the Court for resolution following a bench trial on June 10 and 12, 1991 of the plaintiffs' claim of deprivation of equal protection of the laws under the Fourteenth Amendment of the United States Constitution. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, and on the basis of all the evidence admitted at trial, stipulations and the parties' exhibits, the Court makes the following findings of fact and conclusions of law. The parties' stipulations are incorporated by reference.

*Findings of Fact*

A. PARTIES AND JURISDICTION

1. The Court has jurisdiction of this case pursuant to 28 U.S.C. § 1343 and § 1331.

2. Plaintiff R.I.S.E., Inc. (Residents Involved in Saving the Environment) is a bi-racial community organization formed for the purpose of opposing the development of the proposed regional landfill that is the subject of this case. R.I.S.E. is a not-for-profit corporation organized under the laws of the state of Virginia and is made up primarily of King & Queen County residents who own property in the geographical area of the proposed landfill.

3. Defendant King and Queen County Board of Supervisors consists of five members: R.A. Kay, Jr., R.H. Bourne, J.R. Walton, R.F. Alsop, and W.L. Hickman. Kay, Bourne, and Walton are white and Alsop and Hickman are black. Supervisors Alsop and Hickman were elected in a special election in 1988, following a federally-ordered redistricting which resulted in an increase from three to five supervisors.

## B. LANDFILL SITING PROCESS

1. In 1987, the state of Virginia issued new regulations for solid waste disposal in landfills. The new regulations posed a significant financial problem for King and Queen County. Closing the three existing county landfills, which did not meet the new environmental standards, would cost 1.7 million dollars. The County could not afford to close the existing landfills and develop a new landfill that would comply with the new regulations. Trial testimony of R. Alsop; Plaintiff's Exh. 25.

2. In an effort to solve its increasingly troublesome waste disposal problems, the County initiated negotiations with the Chesapeake Corporation for a joint venture landfill. According to the preliminary plan, Chesapeake would build the landfill and use it for its own waste disposal, and the County would operate the landfill in exchange for free waste disposal.

3. Chesapeake Corp. identified 420 acres of the Piedmont Tract, as a potential landfill site. Trial testimony of R. Kay, Jr.

4. Chesapeake Corp. retained Law Engineering Company of Charlotte, North Carolina to conduct soil studies of the Piedmont Tract to determine its suitability for a landfill. Defendants' Exh. 41.

5. Law Engineering's findings were reported to Chesapeake in a draft Landfill Permit Application dated April 8, 1988. The tests established the site's suitability for landfill development. Defendants' Exh. 41.

6. During the summer of 1988 Chesapeake abandoned the preliminary negotiations for a joint venture and expanded the already existing Prince William landfill for its own waste disposal. Trial testimony of R. Kay, Jr.

7. On January 25, 1989, Supervisors Alsop and Kay met with Chesapeake representatives to negotiate the purchase of property from Chesapeake for use as a landfill site.

8. On February 3, 1989 and February 17, 1989 County Administrator Charles Smith joined Alsop and Kay in further negotiations with Chesapeake.

9. Chesapeake Corp. identified at least two sites for possible landfill development: the Piedmont Tract and the Norman–Saunders Tract. The Supervisors preferred the Piedmont Tract because it had already been tested and, while it was centrally located, it was also remote. Plaintiff's Exh. 25.

10. Contemporaneously, James Cluverius initiated discussions with Jeffrey Southard of BFI Engineering about the County's waste disposal problems. The two met several times in January, February and March 1989.

11. Kay, Alsop, and Cluverius continued discussions with Chesapeake and arrived at an agreement in principle to obtain an option to purchase 420 acres of the Piedmont tract at a price of $1,000 per acre.

12. At a regular Board of Supervisors meeting on October 10, 1989, in public session, Board members officially appointed Alsop and Kay as a "liaison committee" to explore alternatives for the County's future waste disposal needs. Supervisor Walton briefed the participants on the cost of closing the existing landfills to meet state regulations. The Board also passed two resolutions to amend its zoning ordinance as it pertained to landfills. Plaintiffs' Exh. 16.

13. In early October 1989, Supervisor Bourne visited Mr. Carlton, an owner of land bordering the Piedmont tract and a customer of Chesapeake Corp, to solicit his approval for the proposed landfill. Although Mr. Carlton's approval was not made a condition of the contract, Chesapeake representatives made it clear that they would not proceed with the proposal

without Mr. Carlton's approval. Trial testimony of R. Bourne.

14. At a public hearing on November 8, 1989, the Planning Commission recommended amendments to the zoning ordinance regarding landfills. The Board voted to accept the Planning Commission recommendations. Plaintiffs' Exh. 16.

15. At a Board meeting on November 13, 1989, in public session, Supervisor Kay identified the 420 acre Piedmont site under consideration. The Board voted to advertise a public hearing to consider whether the County should acquire an option to purchase the Piedmont tract. Trial testimony of R. Bourne; Plaintiffs' Exh. 17.

16. At the December 11, 1989 public hearing, Kay reported that the County could not afford to operate a landfill on its own. Alsop moved to adopt a resolution authorizing the Board to execute a purchase option agreement with Chesapeake for the 420 acre Piedmont site and that the supervisors sign the option. Hickman seconded the resolution and Kay, Alsop and Hickman voted in favor. Walton and Bourne abstained from voting because they were employees of Chesapeake. Plaintiffs' Exh. 18.

17. The Board executed a purchase option agreement with Chesapeake on December 11, 1989, in accordance with its resolution. Plaintiffs' Exh. 4.

18. Although the Board's public notices did not specifically refer to a "regional" landfill, letters and petitions expressing opposition to the landfill demonstrate that citizens were well aware of the regional nature of the proposed landfill. The regional nature of the landfill was well-publicized in local newspapers. Plaintiffs' Exh. 4, 26–29; Defendants' Exh. 4–7.

19. Board members were responsive to the concerns of area residents and took measures to insure minimal interference with Second Mt. Olive Baptist Church. Board members obtained assurances from BFI that it would pave Rt. 609 and leave a large vegetative buffer between the graveyard and the landfill grounds. Board members also discussed the issue of road improvement with Dept. of Transportation of-

ficials, as a result of which Rt. 614 was moved up on the DOT's six-year priority list. Trial testimony of R. Alsop, R. Kay, Jr., W. Hickman and S. Yob.

### C. COMMUNITY OPPOSITION

1. On January 25, 1990, citizens concerned about the proposed landfill met in Second Mt. Olive Baptist Church. Reverend Taylor, the church's pastor invited the Board of Supervisors to attend the meeting. Supervisors Bourne, Hickman, and Alsop and City Administrator Charles Smith attended the meeting. Plaintiffs' Exh. 3; Trial testimony of Rev. Parham and Rev. Taylor.

2. The citizens expressed concerns that the proposed landfill 1) would reduce the quality of life of area residents by increasing noise, dust and odor; 2) result in a decline in property values; 3) interfere with worship and social activities in Second Mt. Olive Church and grave sites on church grounds; 4) require major improvements in access roads; and 5) result in blighting an historic church and community. The Second Mt. Olive Baptist Church was founded in 1869 by recently freed slaves and subsidized an inadequately funded black school across the road for many years. Trial testimony of Rev. Parham. Plaintiffs' Exh. 3, 27.

3. On February 12, 1990, the Board held a public hearing and invited BFI to make a presentation about the operation of a regional landfill. Two hundred and twenty-five citizens attended the hearing and fifteen citizens spoke in opposition to the proposal. In addition, the Board was presented with a petition signed by 947 individuals opposing the regional landfill. Trial testimony of Rev. Parham. Plaintiffs' Exh. 29, 31.

4. Following public comment, the Board voted unanimously to authorize the development of a landfill and to continue negotiations with BFI and other private contractors.

5. By letter to Supervisor Bourne dated March 23, 1990, James (Donnie) Sears, Chairman of the Concerned Citizen's Steer-

ing Committee, the apparent precursor of R.I.S.E., requested that the Board establish a Regional Landfill Citizen's Advisory Committee before signing a contract. He also submitted a list of four proposed alternative sites for the landfill. Plaintiffs' Exh. 43. Trial testimony of J. Sears.

6. By letter dated April 4, 1990, and upon the request of the Board, Mr. Sears narrowed the list of alternative sites to one site; specifically, the Mantapike Tract. Plaintiffs' Exh. 44.

7. BFI representative Jeffrey Southard and Steven Yob, together with County Administrator Smith, inspected the Mantapike site. Southard and Yob concluded that the site was environmentally unsuitable because of the slope of the land and the existence of a stream running through its center. They reported their conclusions to the Board. The racial composition of the area surrounding the Mantapike Tract was 85% black. Trial testimony of Steven Yob, C. Culley; Defendants' Exh. 20.

8. R.I.S.E. was incorporated in May 1990 by James Sears and Keith Parham. Defendants' Exh. 37.

9. R.I.S.E. was a bi-racial group initially concerned with environmental problems. Race discrimination did not become a significant public issue until it appeared that the initial thrust was failing.

10. In July 1990, the Board adopted a resolution approving the Planning Commission's recommendation that the Piedmont Tract be rezoned from an agricultural to an industrial area. Alsop, Kay, and Hickman voted in favor of the resolution, Bourne voted against it, and Walton abstained. The Board also approved a proposal to hold a public hearing on August 13, 1990 to consider a lease agreement for the Piedmont Tract and went into executive session to consider the terms and provisions of a lease agreement between the Board and BFI for the operation of a landfill. Plaintiffs' Exh. 36.

11. At an August 13, 1990 public hearing the Board passed a resolution to enter into a lease of the Piedmont site to BFI to operate a landfill. Alsop, Kay, and Hickman voted in favor of the resolution, Bourne voted against it, and Walton abstained. Plaintiffs' Exh. 37.

D. DEMOGRAPHIC ANALYSIS OF COUNTY LANDFILL SITES

1. The population of King and Queen County is approximately fifty percent black and fifty percent white.

2. Thirty-nine blacks (64% of total) and twenty-two whites (36% of total) live within a half-mile radius of the proposed regional landfill site. Most of the landfill-bound traffic will travel along a 3.2 mile stretch of Rt. 614, between Rt. 14 and Rt. 609. Twenty-one of the twenty-six families living along the 3.2 mile stretch are black and 5 are white. Trial testimony of Doris Morris, C. Culley; Defendants' Exh. 18.

3. The Mascot landfill was sited in 1969. None of the present Board members were serving on the Board at that time. At the time the landfill was developed, the estimated racial composition of the population living within a one mile radius of the site was 100% black. The Escobrook Baptist Church, a black church, was located within two miles of the landfill. Trial testimony of C. Culley. Defendants' Exh. 22.

4. The Dahlgren landfill was sited in 1971. None of the current Board members were on the Board at that time. An estimated 95% of the population living in the immediate area at the time the landfill was built were black. Presently, an estimated 90–95% of the residents living within a two-mile radius are black. Trial testimony of A. Powers and C. Culley.

5. The Owenton landfill was sited in 1977. Supervisors Kay and Bourne were serving on the Board when the landfill was developed. In 1977, an estimated 100% of the residents living within a half-mile radius of the landfill were black. The area population is still predominantly black. The First Mount Olive Baptist Church, a black church, is located one mile from the landfill. Trial testimony of F. Holmes, Jr.

E. THE KING LAND CONTROVERSY

1. In 1986, King Land Corporation set up and began to operate a private landfill

on a 120 acre site located in King and Queen County and owned by the Corporation. The County did not have a zoning ordinance in effect at that time; it was therefore unnecessary for King Land to obtain County approval of the landfill. Defendants' Exh. 1.

2. The Board of Supervisors hired attorney James Cluverius to challenge the King Land operation. Mr. Cluverius advised the Board to implement a zoning ordinance.

3. From its inception, the King Land landfill was an environmental disaster. King Land began dumping without performing the necessary geotechnical tests. Tests results later revealed incinerator ash buried in the ground water and the absence of clay soil to prevent ground water pollution. Trial testimony of Robert Kay, Jr. Defendants' Exh. 1.

4. The County implemented a zoning ordinance, effective August 12, 1986. On January 27, 1986, the County obtained an injunction in Circuit Court to prevent King Land Corp. from operating its landfill under a state-issued permit. Defendants' Exh. 1.

5. Following the issuance of the injunction, King Land Corp. sought permission to operate its landfill under the County zoning ordinance. In January 1987 the County Zoning Administrator determined that the King Land operation was not a "nonconforming use" as defined in the zoning ordinance, thereby prohibiting landfill operation on the site. Defendants' Exh. 1.

6. King Land Corp. appealed the Administrator's decision to the Board of Zoning Appeals, which heard the appeal on March 16, 1987. The Board of Appeals upheld the determination of the Zoning Administrator. The Board later denied King Land's application for a variance to use the property as a sanitary landfill. The Board found that the landfill operation would result in a significant decline in the property values of the adjacent properties and that King Land had ignored environmental, health, safety, and welfare concerns. Defendants' Exh. 1.

7. The racial composition of the residential area surrounding the King Land landfill is predominantly white. Plaintiffs' Exh. 41.

### Conclusions of Law

1. In *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, the U.S. Supreme Court identified the following factors to be considered in determining whether an action was motivated by intentional race discrimination: 1) the effect of the official action; 2) the historical background of the decision; 3) the specific sequence of events leading up to the challenged decision; 4) departures from normal procedures; 5) departures from normal substantive criteria; and 6) the administrative history of the decision. 429 U.S. 252, 266–68, 97 S.Ct. 555, 563–65, 50 L.Ed.2d 450 (1977).

2. The placement of landfills in King and Queen County from 1969 to the present has had a disproportionate impact on black residents.

3. However, official action will not be held unconstitutional solely because it results in a racially disproportionate impact. Such action violates the Fourteenth Amendment's Equal Protection Clause only if it is *intentionally* discriminatory. *Id.* at 264–65, 97 S.Ct. at 563, citing *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). See also *East–Bibb Twiggs Neighborhood Association v. Macon Bibb Planning & Zoning Commission*, 896 F.2d 1264, 1266 (11th Cir.1990).

4. The impact of an official action—in this case, the historical placement of landfills in predominantly black communities—provides "an important starting point" for the determination of whether official action was motivated by discriminatory intent. *Arlington Heights*, 429 U.S. at 266, 97 S.Ct. at 564.

5. However, the plaintiffs have not provided any evidence that satisfies the remainder of the discriminatory purpose equation set forth in *Arlington Heights*. Careful examination of the administrative steps taken by the Board of Supervisors to negotiate the purchase of the Piedmont Tract and authorize its use as a landfill site

reveals nothing unusual or suspicious. To the contrary, the Board appears to have balanced the economic, environmental, and cultural needs of the County in a responsible and conscientious manner.

6. The Board's decision to undertake private negotiations with the Chesapeake Corporation in the hope of reaching an agreement to operate a joint venture landfill was perfectly reasonable in light of the County's financial constraints.

7. Once this deal fell through, the Board was understandably drawn to the Piedmont Tract because the site had already been tested and found environmentally suitable for the purpose of landfill development.

8. The Board responded to the concerns and suggestions of citizens opposed to the proposed regional landfill by establishing a citizens' advisory group, evaluating the suitability of the alternative site recommended by the Concerned Citizens' Steering Committee, and discussing with landfill contractor BFI such means of minimizing the impact of the landfill on the Second Mt. Olive Church as vegetative buffers and improving access roads.

9. Both the King Land landfill and the proposed landfill spawned "Not In My Backyard" movements. The Board's opposition to the King Land landfill and its approval of the proposed landfill was based not on the racial composition of the respective neighborhoods in which the landfills are located but on the relative environmental suitability of the sites.

10. At worst, the Supervisors appear to have been more concerned about the economic and legal plight of the County as a whole than the sentiments of residents who opposed the placement of the landfill in their neighborhood. However, the Equal Protection Clause does not impose an affirmative duty to equalize the impact of official decisions on different racial groups. Rather, it merely prohibits government officials from intentionally discriminating on the basis of race. The plaintiffs have not provided sufficient evidence

to meet this legal standard. Judgment is therefore entered for the defendants.

It is so ORDERED.