S05A0780. GRIFFIN v. CITY COUNCIL OF MILLEDGEVILLE et al.

(621 SE2d 734)

HUNSTEIN, Presiding Justice.

Floyd Griffin, mayor of the City of Milledgeville, filed suit seeking injunctive relief to prevent Milledgeville's city council and its six individual members from changing the city's form of government from the existing strong mayor/weak council system to a strong council/weak mayor system in which most of the mayor's substantive administrative duties would be handled by a city manager answerable only to the council. Griffin appeals from the superior court's order finding that the office of mayor was not abolished in violation of OCGA § 1-3-11, that the local legislation passed by the General Assembly to accomplish the change was not unconstitutional and that the defendants were entitled to judgment as a matter of law. For the reasons that follow, we affirm.

The record reflects that under the prior city charter, the mayor of Milledgeville was given the power to, inter alia, appoint the members of all city council committees; to nominate persons to perform all the major official duties of the city,[1] all of whom would thereafter serve at the mayor's pleasure; to prepare the city's budget with the advice and approval of the council; to veto the amount budgeted in any category for any department; and to veto any ordinance, rule or regulation adopted by the council. For the performance of these and other duties the mayor was paid $525 per month for a two-year term of office.

The facts, as presented in the record or unchallenged by the parties in their briefs, reflect that in the 1990s the city council had tried to move the city to a city manager form of government but the attempt was vetoed by the then-mayor who had enough support on

---

[1] Those officials are: clerk and treasurer, chief of police, chief of the fire department, all city department heads, city recorder, and city attorney.

the council to block the votes needed to override the veto. In 2001 Griffin ran for the office of mayor on a platform that included the employing of a city administrator to run the day-to-day operations of the city; the council members ran for election on a platform to install a city manager. Griffin was the first African-American to be elected mayor of the city; half of the council members elected are also African-American. In September 2002 after Griffin vetoed the council's unanimous resolution to introduce legislation to create the office of city manager, the council unanimously overrode his veto. Several public council meetings were conducted on the issue as well as a public hearing led by the local legislative delegation attended by the council members. Once the details of the proposed amendment to the city charter were finalized, the council unanimously passed a resolution to present the amendment language to the local legislative delegation. Griffin vetoed the resolution, which the council thereafter unanimously overrode. In 2003 the proposed amendment to the city charter was presented to the General Assembly as House Bill 800; the local legislation, Act No. 33, was passed unanimously by both the House and the Senate and was signed by the governor in May 2003. The Act was then submitted, along with other documentation, to the Voting Section of the Civil Rights Division of the Department of Justice for preclearance, see 42 USCA § 1973 (c), which issued a letter of approval in August 2003. Griffin filed suit two weeks later asserting, inter alia, that the Act "will strip the first African-American elected mayor of Milledgeville of his executive powers in violation of the 14th and 15th Amendments to the United States Constitution and diminish the power of the African-American electorate in Milledgeville."[2]

Under the Act, the mayor's duties consist of presiding at all city council meetings; serving as the city's head for ceremonial purposes and for service of process; serving as the city's official spokesperson and chief advocate of policy; administering oaths and taking affidavits; signing on behalf of the city all written and approved contracts, ordinances and other instruments executed by the city; appointing members of citizen advisory boards and commissions with the advice and consent of the council; representing the city in intergovernmental relations; voting on matters before the city council in the event of a tie; appointing council committees (with each council member chairing at least one committee) and all ad hoc committees; and

---

[2] According to appellees, Griffin also filed suit in Federal district court, asserting claims under the Voting Rights Act, 42 USCA § 1973 et seq., and, pursuant to 42 USCA § 1983, the Fourteenth and Fifteenth Amendments. Appellees attached to a supplemental brief in this Court an uncertified copy of the district court's ruling in February 2005 disposing of Griffin's suit adversely to him with the grant of appellees' motion for summary judgment.

presenting an annual state of the city message. The Act also provides, inter alia, for the appointment and removal of a city manager by a majority of the council members and gives the city manager the duty to nominate all appointive officers and directors (with confirmation by a majority of the council), except for city attorney, who is appointed by a majority of the council.

1. Griffin contends the trial court erred when it found that the office of mayor of the City of Milledgeville was not abolished by the Act, thereby improperly allowing for the abolition of his office during his term of office in violation of OCGA § 1-3-11. Georgia law is clear that a local or special act cannot abolish an office to which a person has been elected during the term for which such person was elected unless the change is approved in a referendum by the voters affected by the change. OCGA § 1-3-11; see also *Massenburg v. Commrs. of Bibb County*, 96 Ga. 614, 617 (23 SE 998) (1895). "To abolish an office means to abrogate, annihilate, destroy, extinguish, or put an end to it. [Cits.]" *Webb v. Echols*, 211 Ga. 724, 726 (88 SE2d 625) (1955) (upholding a local act that expanded a one-person board to a three-person board and provided that the sole incumbent would continue for the remainder of his elected term in office as one of the three board commissioners). However, this Court has recognized that an office need not be directly abolished in order to violate OCGA § 1-3-11. In *Morris v. Glover*, 121 Ga. 751 (49 SE 786) (1904), a case involving a local act that merged the office of county treasurer into the office of court clerk, we discussed the predecessor to OCGA § 1-3-11 and held that the Legislature may not, "by indirection, accomplish what it is restrained from doing" directly. Id. at 753 (1).

> If the duties and emoluments of [one] office be transferred to another officer, then there would exist the anomalous condition of an officer recognized by the constitution without duties or emoluments. The duties and emoluments are of the substance of the office; its name but the semblance. . . . When the legislature assumed to transfer to the clerk of the superior court all the duties and emoluments which belonged to the office of treasurer, it practically abolished the office of treasurer.

Id. at 754-755 (1).

The Act amending the city charter did not directly abolish the office of mayor. The office, with its emoluments and duties, continues to exist, albeit with a change in the nature of the duties to be performed by the individual holding the office. The Act restructured the form of the government to transfer to the council or city manager those duties on which the political power of the mayor's office had

previously been based, leaving the mayor with mostly ceremonial duties. It is Griffin's contention that because the Act "stripped" the office of its substance, it indirectly abolished the office in violation of OCGA § 1-3-11. We disagree.

Unlike the situation in *Morris*, supra, the Act did not accomplish indirectly what it was prohibited from doing directly. It did not remove all of the duties of the mayor's office, leaving only the name. The office still involves the performance of numerous duties, which include casting the deciding vote when the council is tied, a not inconsiderable power given a city council composed of six members. See, e.g., United States Constitution, Art. I, Section 3 (vice president shall be president of the Senate "but shall have no Vote, unless they be equally divided"). Even if the duties required of the office under the Act were only ceremonial, the mayor of Milledgeville remains mayor, albeit a "weak" mayor rather than a "strong" mayor. Nothing in OCGA § 1-3-11 prohibits the Legislature from altering the nature of the duties that devolve upon the holder of an office as long as the remaining duties are appropriate to the office.

Accordingly, because the Act did not abolish the office of mayor of Milledgeville or change the term of the office, no question of fact remains that the Act did not violate OCGA § 1-3-11.

2. Contrary to Griffin's contention, no referendum was required to be held pursuant to OCGA § 1-3-11 because the Act did not abolish the office of mayor. See Division 1, supra. Furthermore, because the statutory procedure for the enactment of local legislation does not require the holding of public hearings, see OCGA § 28-1-14, we find meritless Griffin's assertion unsupported by any legal authority that the trial court erred by allowing the change in the form of city government to occur without a public hearing.

3. Based on our review of the provisions in the city charter setting forth the voting procedure for the "transaction of all business of the municipal government" and the "pass[ing of] any measure," we find no merit in Griffin's contention that the Act must be considered invalid because it lacks language specifying the number that must be cast by council members in order to approve the mayor's recommendations regarding the appointment of committee members.

4. The council members, by lawfully voting to change the charter, did not violate in any manner their oath of office to enforce the city's charter.

5. We need not address Griffin's contention that the change in form of government denies African-Americans political power in contravention of the Voting Rights Act because even assuming, arguendo, that jurisdiction over such a claim was proper in the superior court, no such claim was either raised or ruled upon below.

6. Griffin contends the trial court erred by not declaring the Act to be in violation of the Equal Protection Clause of the United States Constitution. We do not agree.

(a) Although Griffin contends that the Fourteenth Amendment protects individuals from vindictive unequal treatment and thus his equal protection rights have been violated because the city charter was amended "not to fulfill [a] legitimate purpose, but instead to harm him because [the city council members] disliked him," Griffin can point to no evidence in the record to support his claim. Nothing in the Act itself reflects any vindictiveness toward Griffin or any other individual nor was any evidence adduced that rebuts the testimony by the council member, given at the hearing on the motion for a preliminary injunction, who stated that the charter amendment "doesn't have anything to do with who the mayor is." Nor has Griffin produced any evidence to rebut a council member's testimony that the council acted to fulfill a legitimate purpose, in that the city needed to go to the city manager form of government because it was "a more efficient way to use taxpayer dollars. It's someone in charge on a day-to-day basis to make sure that each department runs as financially and fiscally responsible as it can, and that's the highest and best use of taxpayer dollars."

(b) In order for the Equal Protection Clause to be violated, "the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose." *Washington v. Davis*, 426 U. S. 229, 240 (96 SC 2040, 48 LE2d 597) (1976). See also *Reno v. Bossier Parish School Bd.*, 520 U. S. 471, 481 (117 SC 1491, 137 LE2d 730) (1997). Thus, to prevail in his contention that the Act unconstitutionally diminished the political power of African-American voters in Milledgeville, Griffin had to prove the Act was " 'conceived or operated as [a] purposeful [device] to further racial discrimination.' " *Rogers v. Lodge*, 458 U. S. 613, 617 (102 SC 3272, 73 LE2d 1012) (1982). "Such a requirement 'is simply one aspect of the basic principle that only if there is purposeful discrimination can there be a violation of the Equal Protection Clause of the Fourteenth Amendment.' [Cit.]" Id. at 619. While discriminatory intent need not be proved by direct evidence, see *Washington v. Davis*, supra, 426 U. S. at 242 ("[n]ecessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts"), our review of the totality of the facts adduced in the record, conducted pursuant to the framework in *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U. S. 252, 266-268 (97 SC 555, 50 LE2d 450) (1977), establishes that Griffin failed to present evidence raising even an inference that the shift from a strong mayor/weak council system to a strong council/weak mayor system was "conceived or operated as" a purposeful means to further racial discrimination. Accordingly, the trial

court did not err by granting summary judgment to appellees. See generally *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

*Judgment affirmed. Sears, C. J., Benham, Carley and Hines, JJ., and Judge Bonnie Chessher Oliver and Judge M. Gino Brogdon, Sr., concur. Thompson, J., not participating, and Melton, J., disqualified.*

DECIDED NOVEMBER 7, 2005.

*James E. Voyles*, for appellant.

*Chambless, Higdon, Richardson, Katz & Griggs, Thomas F. Richardson, Frances L. Clay*, for appellees.

*Janice L. Mathis, Willie Martin, Sonjia A. Malloy, C. Jack Ellis*, amici curiae.