**MONTRES ROLEX, S.A.,**
**Plaintiff-Appellee,**

v.

**Dennis SNYDER, Regional Commissioner, United States Customs Service and United States Customs Service, Defendants-Appellants,**

**Grand Jewels, Inc., Intervenor.**

**No. 651, Docket 82–6168.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 24, 1983.

Decided Sept. 14, 1983.

David H.T. Kane, New York City (Siegrun D. Kane, Barbara A. Larsen, Kane, Dalsimer, Kane, Sullivan and Kurucz, New York City, of counsel), for plaintiff-appellee.

Jonathan A. Lindsey, Asst. U.S. Atty., S.D.N.Y., New York City (John S. Martin, Jr., U.S. Atty., S.D.N.Y., Peter C. Salerno, Asst. U.S. Atty., New York City, of counsel), for defendants-appellants.

Russell H. Falconer, New York City (Doreen J. Leavens, Brumbaugh, Graves, Donohue & Raymond, New York City, of counsel), for intervenor.

Before OAKES, PRATT and WEIS *, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

This case of first impression presents important questions concerning Congress's effort to protect domestic trademarks from foreign counterfeiters. The major issues

* Hon. Joseph F. Weis, Jr., of the United States Court of Appeals for the Third Circuit, sitting by designation.

are (1) whether the definition of a "counterfeit" trademark, incorporated from the Lanham Act by § 211 of the Customs Procedural Reform and Simplification Act of 1978, Pub.L. No. 95–410, 92 Stat. 888, 903–04, 19 U.S.C. § 1526(e) (Supp. V 1981), should be applied from the standpoint of an average purchaser or an expert, and (2) whether the alleged counterfeit mark should be compared with the "registered mark" as the latter appears on actual merchandise or as it appears on a registration certificate filed with Customs. Adopting the average purchaser test and comparing the challenged mark with the registered mark imprinted on actual merchandise, Judge Broderick below ruled that the designs on a shipment of 18-karat gold watch bracelets imported by intervenor Grand Jewels, Inc. ("the importer") were counterfeits of plaintiff Montres Rolex, S.A.'s registered trademark. Accordingly, he ordered Customs to comply with the mandatory forfeiture provisions of § 1526(e). Because Judge Broderick's interpretation and application of § 1526(e) is fully consistent with its punitive and deterrent purposes, we affirm.

I. *Facts, Administrative Proceedings, and Decision Below.*

In early May 1981, a Customs import specialist at J.F.K. International Airport in New York detained a shipment of approximately 100 18-karat solid gold watch bracelets, each bearing a fan or crown-like design on the clasp. The bracelets were destined for Grand Jewels, Inc., a New York City retailer. Suspecting a possible violation of Rolex's trademark rights, the specialist forwarded samples of the bracelets to Joseph J. DeNardo, Assistant Chief of Customs' Imports Compliance Branch. Following standard operating procedures, DeNardo compared the designs on the bracelets' clasps with the drawing of the Rolex trademark on the registration certificate Rolex had filed with Customs pursuant to 19 C.F.R. § 133.1–:7. By letter dated May 12, 1981, DeNardo advised the importer that:

Examination of two samples from the shipment reveals that they both bear a crown design which is considered to infringe on the registered and recorded "Crown Design" trademark owned by Montres Rolex S.A. in violation of the Trademark Law (15 U.S.C. § 1124).

Accordingly, this merchandise is a prohibited importation and subject to seizure and forfeiture unless written consent is received from the trademark owner * *.

When advised that the Grand Jewels bracelets had been detained, Rolex refused to consent to the importation, notwithstanding Grand Jewels' offer to remove the offending marks. Rather, Rolex contended that the imported bracelets bore counterfeit marks within the meaning of § 1526(e) and demanded that they be forfeited.

With the importer and the trademark owner thus at loggerheads, DeNardo again examined the designs on the surface of the imported bracelets' clasps to determine formally whether they constituted counterfeits. He carefully compared those designs, element-by-element and as a whole, with the crown design protected as Rolex's trademark filed with Customs. Because of the minute size of the crowns and their elements, DeNardo used a jeweler's magnifying loupe in the course of his examination.

In a brief letter decision dated July 22, 1981, DeNardo ruled that the designs on the sample bracelets were not counterfeit trademarks. He concluded, therefore, that the detained goods need not be forfeited and could be lawfully imported after the infringing marks were removed or obliterated. A later examination of an authentic Rolex bracelet, supplied by Rolex, did not lead him to change his mind.

Upon Rolex's request for review, Darrell D. Kast, Chief of Customs' Entry, Licensing, and Restricted Merchandise Branch, affirmed DeNardo's decision. Kast reasoned that:

Although the appearance of the mark used on the imported bracelet is very similar to that of the crown design applied to the Rolex bracelet, it can easily

be distinguished from the drawing of the official "Crown Design" on the trademark registration. For example, we note that the spikes on the crown design on the sample bracelets submitted are not nearly as long or as tapered in appearance as they are in the official version of the "Crown Design" and that the spacing between the balls at the top of the spikes is minimal and not as clearly defined.

Accordingly, we are of the opinion that the mark that appears on the imported [Grand Jewels] bracelets merely copies or simulates the genuine Rolex "Crown Design" trademark. While the mark in question is close enough in appearance to cause some confusion on the part of the average purchaser at retail as to the source of the bracelet, the infringement, in our opinion, does not amount to a "counterfeit trademark" violation, and the laws and regulations governing "counterfeit trademark" violations would not apply.

Rolex then brought this suit seeking a preliminary and permanent injunction that would require Customs to declare the bracelets counterfeit and therefore forfeited. Following a trial on the merits, accelerated pursuant to Fed.R.Civ.P. 65(a)(2), Judge Broderick in an oral decision found that Rolex had standing to challenge Customs' determination that the Grand Jewels bracelets were not counterfeits, and that jurisdiction was available under the Mandamus Act, 28 U.S.C. § 1361 (1976), and under the general federal question provision, 28 U.S.C. § 1331 (Supp. V 1981). On the merits, Judge Broderick ruled that Customs had erred as a matter of law in two respects in determining whether the Grand Jewels bracelets were counterfeits: it should have compared the designs on the accused bracelets with the marks on actual Rolex bracelets, rather than with the pen-and-ink drawing on the Rolex trademark registration certificate, and it should have examined the bracelets from the perspective of an average purchaser rather than an expert. Applying the proper standards, Judge Broderick held that "the average buyer examining a bracelet carrying the

infringing mark would, if he or she were familiar with plaintiff's mark, conclude that the infringing mark was in fact plaintiff's mark." He then entered judgment (1) determining Customs' ruling to be erroneous, (2) declaring that the marks on the imported bracelets were counterfeits and that the bracelets should be forfeited in the absence of Rolex's consent, and (3) directing Customs to declare the marks counterfeit and to dispose of the merchandise.

## II. *The Statutory and Regulatory Scheme.*

The statute at the center of this dispute, 19 U.S.C. § 1526(e), provides as follows:

Any such merchandise [manufactured abroad] bearing a counterfeit mark (within the meaning of section 1127 of Title 15) imported into the United States in violation of the provisions of section 1124 of Title 15, shall be seized and, in the absence of the written consent of the trademark owner, forfeited for violations of the customs laws. Upon seizure of such merchandise, the Secretary [of the Treasury] shall notify the owner of the trademark, and shall, after forfeiture, obliterate the trademark where feasible and dispose of the goods seized * * *

*See also* 19 C.F.R. § 133.23a(b), (c).

The statutory provisions to which § 1526(e) refers, 15 U.S.C. §§ 1124 and 1127, correspond to sections 42 and 45 of the Lanham Act. Section 1127, the Lanham Act's general definitional section, defines a "counterfeit" as "a spurious mark which is identical with, or substantially indistinguishable from, a registered mark." Section 1124 generally prohibits the importation of goods which "copy or simulate" a registered trademark. Under 19 C.F.R. § 133.21(a), a "'copying or simulating' mark or name" is either "an actual counterfeit of the recorded mark" or "is one which so resembles it as to be likely to cause the public to associate the copying or simulating mark with the registered mark or name." The latter component of this definition tracks the language of that part of section 1127 which defines the term "colorable imitation" as "any mark which so re-

sembles a registered mark as to be likely to cause confusion or mistake or to deceive." Similarly, 19 C.F.R. § 133.23a(a) tracks section 1127 by defining a "counterfeit trademark" as "a spurious trademark which is identical with, or substantially indistinguishable from, a registered trademark."

Thus the customs laws and regulations create a two-tier classification scheme. The first category consists of marks which are merely infringements, judged by whether they are likely to cause the public to associate the copying mark with the recorded mark. In the second category are those marks which not only infringe but in addition are such close copies that they amount to counterfeits.

■ The significance of this distinction emerges from the consequences that are attached to the two categories. Counterfeits are treated harshly: absent written consent of the trademark owner they "shall be seized and * * * forfeited". 19 U.S.C. § 1526(e); 19 C.F.R. § 133.23a(b). On the other hand, merely infringing articles may be imported, provided that:

> [t]he objectionable mark is removed or obliterated prior to importation in such a manner as to be illegible and incapable of being reconstituted, for example by:
>
> (i) Grinding off imprinted trademarks wherever they appear;
>
> (ii) Removing and disposing of plates bearing a trademark or trade name

19 C.F.R. § 133.21(c)(4).

### III. *Customs' Threshold Claims.*

On appeal, Customs has not pressed its procedural claims; it has simply remarked in a footnote in its brief that "the district court's conclusion[s] as to both mandamus jurisdiction and standing appear to be erroneous * * *." Similarly, neither Rolex nor Grand Jewels briefed or argued these issues. Nevertheless, because "our jurisdiction to decide the case is implicated," *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 260, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977), we are compelled to briefly address these novel questions.

### A. *Standing.*

Customs argued below that its resolution of the counterfeit issue—even if erroneous—did not injure Rolex in a manner sufficient to confer standing under Article III of the Constitution. The crux of its argument was that the Grand Jewels bracelets had already been declared infringements and that the offending marks would therefore have to be obliterated before the merchandise was released. Under these circumstances, Customs contended, Rolex was not exposed to any actual or threatened harm, much less the type of "injury in fact" required by Article III.

■ We think that Customs takes too narrow a view of the consequences to Rolex of an adverse determination here. Commercial counterfeiting has reached epidemic proportions. *See generally* Rakoff & Wolff, *Commercial Counterfeiting and the Proposed Trademark Counterfeiting Act,* 20 Am.Crim.L.Rev. 145 (1982). As we previously witnessed in *Matter of Vuitton et Fils S.A.,* 606 F.2d 1 (2d Cir.1979), the owners of trademarks on prestige items are particularly likely to be plagued by recurring counterfeit problems. Indeed, in this case Customs official DeNardo testified that the Grand Jewels bracelets were not the first batch of fake Rolex merchandise that Customs had intercepted. And Rolex's expert confirmed that Rolex encounters three or four counterfeits a week.

Given this predicament, there is more at stake for Rolex in this action than the fate of this particular shipment of Grand Jewels bracelets. A ruling that the designs on these bracelets were not counterfeits of Rolex's trademark, despite the fact that only an expert could distinguish between the two, would remove a major disincentive that might otherwise prevent counterfeiters from pirating Rolex's mark. Counterfeiters would be free to copy the Rolex crown with relative impunity, safe in the knowledge that if their merchandise was intercepted at Customs and deemed an infringement, they could still salvage most of their investment

by selling the merchandise after the offending marks were removed.

Contrary to Customs' position below, this potential harm to Rolex is not so abstract or speculative as to deny Article III standing. As this court, sitting *en banc,* recognized in *City of Hartford v. Towns of Glastonbury,* 561 F.2d 1032, 1050 (2d Cir.1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 766, 54 L.Ed.2d 781 (1978) (quoting *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252 at 260–61, 97 S.Ct. 555 at 561 (citations omitted)):

> The essence of the standing question, in its constitutional dimension, "is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant *his* invocation of federal court jurisdiction and to justify exercise of the court's remedial powers on his behalf." ... The plaintiff must show that he himself was injured by the challenged action of the defendant. The injury may be indirect ... but the complaint must indicate that the injury is indeed fairly traceable to the defendant's acts or omissions.

In the present case, the challenged action of defendants places a uniquely personal interest of Rolex in jeopardy. And Rolex has established at least a substantial probability that it will in fact be harmed. In our view, this is sufficient to confer standing. *See Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 218 n. 8, 99 S.Ct. 1667, 1672 n. 8, 60 L.Ed.2d 156 (1979); *Ludlow Corp. v. SEC,* 604 F.2d 704, 706 (D.C.Cir. 1979); *cf. Warth v. Seldin,* 422 U.S. 490, 504, 95 S.Ct. 2197, 2208, 45 L.Ed.2d 343 (1975).

Furthermore, "where a dispute is otherwise justiciable, the question whether the litigant is a 'proper party to request an adjudication of a particular issue,' * * * is one within the power of Congress to determine." *Sierra Club v. Morton,* 405 U.S. 727, 732 n. 3, 92 S.Ct. 1361, 1365 n. 3, 31 L.Ed.2d 636 (1972) (citation omitted). Here, Congress has passed a statute that expressly requires notification of the trademark owner after counterfeit merchandise is seized.

Together with the applicable regulations, *see* 19 C.F.R. § 133.23a, the statute contemplates that the trademark owner will play an active role in the ensuing administrative process. It is not unreasonable to assume that Congress also intended for the trademark owner to have some input into the initial administrative determination as to whether the detained merchandise was counterfeit. Indeed, that is apparently the way Customs interpreted the statute at the administrative level in this case, for it permitted Rolex actively to participate in the Customs proceedings. It would be anomalous to rule now that Rolex had no standing to pursue this appeal.

■ Finally, we cannot overlook that the result of accepting Customs' standing argument would be to render its decision unreviewable. In the absence of any explicit indication, we will not assume that Congress intended to entrust Customs with final disposition of substantial competing commercial interests through the exclusive administration of § 1526(e).

## B. *Subject Matter Jurisdiction.*

■ Turning briefly to Customs' second threshold argument, we need not determine whether the district court had jurisdiction to adjudicate this dispute under the Mandamus Act, 28 U.S.C. § 1361. While the district judge did find that mandamus jurisdiction was appropriate, he also found that the court had general federal question jurisdiction under 28 U.S.C. § 1331, and this latter ruling is unassailable. Kast's administrative affirmance of DeNardo's initial decision unquestionably qualified as reviewable "final agency action" under 5 U.S.C. § 704 (1982), since Rolex had exhausted its administrative remedies. And the district court clearly had jurisdiction to review Rolex's challenge to Kast's final determination under § 1331 as an action arising under § 1526(e).

■ Further, to the extent that Rolex sought mandatory relief, it was well within the district court's traditional equitable powers to award it in an action based on

§ 1331. Any doubts as to whether these powers may be exercised in this context are laid to rest by 5 U.S.C. § 703 (1982), which provides that a court reviewing agency action may issue "writs of prohibitory or mandatory injunction * * *".

Thus, mandamus jurisdiction, if available, would be superfluous. *See* 4 K. Davis, *Administrative Law Treatise* §§ 23:8–23:14 (2d ed. 1983). We therefore do not reach the academic question of whether, in the circumstances present here, § 1361 might be an appropriate vehicle for challenging Customs' decision.

## IV. *The Merits.*

■ We turn, finally, to the substantive issues presented on this appeal. The standard of review here, as it was in the district court, is whether Customs' determination that the Grand Jewels bracelets were not counterfeits within the meaning of § 1526(e) was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law". 5 U.S.C. § 706(2)(A) (1982).

### A. *Average Purchaser or Expert?*

The central disagreement dividing the parties on appeal concerns the standard that should be applied in determining whether the marks on the Grand Jewels bracelets bear a "counterfeit mark" under § 1526(e). Customs contends that only an expert can determine whether the bracelets are "identical with or substantially indistinguishable from" Rolex's mark. On the other hand, Rolex argues, Grand Jewels concedes, and Judge Broderick below held, that this determination should be made from the standpoint of an average purchaser.

■ Neither § 1526(e) itself, the applicable regulations, nor prior case law sheds any light on this question. As we earlier indicated, the statute and the regulations together incorporate the Lanham Act's definitional distinction between "counterfeits" and those "colorable imitations" that merely infringe a protected mark. Unlike the customs laws and regulations, however, the Lanham Act does not impose different penalties for these two types of violations. As a result, courts deciding cases directly under the Lanham Act have never had to wrestle with this distinction. Thus, while it is well settled that whether an article is an infringement, *i.e.*, sufficiently similar to cause public confusion, must be determined from the perspective of an average consumer, *see, e.g., Electronic Communications, Inc. v. Electronic Components for Industry Co.*, 443 F.2d 487, 492 (8th Cir.), *cert. denied*, 404 U.S. 833, 92 S.Ct. 80, 30 L.Ed.2d 63 (1971); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 542 (2d Cir.1956), there is no similar body of law construing the definition of "counterfeit".

Nor is there any legislative history directly on point. The Customs Procedural Reform and Simplification Act of 1978 was a multi-faceted measure which effected major substantive and procedural changes in the customs laws. Section 211, codified at 19 U.S.C. § 1526(e), represented only one of many changes, and the precise meaning of the term "counterfeit", as used in the amendment, did not receive express consideration in any of the written reports that were generated, in any of the hearings that were conducted, or in any floor debate that took place.

On the other hand, the general thrust of § 1526(e) is easy to discern from the context, as opposed to the express recitals, of the legislative history. Prior to 1978, imported goods caught bearing a counterfeit mark could be admitted into this country after removal of the offending mark, or they could be exported to another country. 19 U.S.C. § 1526; 19 C.F.R. § 133.21(c)(1)–(7); *see* Walker, *A Program To Combat International Commercial Counterfeiting*, 70 Trade-Mark Rep. 117, 125–26 (1980). Counterfeiters therefore ran very little risk, since even if their goods were intercepted by Customs, they could still salvage, perhaps even profit from, their investment.

Section 211 was not included in the version of the Customs Procedural Reform and Simplification Act that was originally introduced in the House of Representatives. It was added by the Senate Finance Committee, apparently at the behest of a coalition of European and American companies which had mounted an international lobby-

ing effort to combat commercial counterfeiting. *See* Walker, *supra,* 70 Trade-Mark Rep. at 126. One of the reasons for this amendment was expressed in the Senate Finance Committee report:

> The committee believes that there is now no effective sanction against violations of section 42 [42 U.S.C. § 1124] as it relates to merchandise which simulates or copies a registered trademark. Under present law, Customs may immediately sell goods bearing a counterfeit trademark after forfeiture. Such a disposition puts the counterfeit goods in competition with legitimate trademark goods.

S.Rep. No. 778, 95th Cong., 2d Sess. 34, *reprinted in* 1978 U.S.Code Cong. & Ad. News 2211, 2245. This was expanded upon in the House Conference report:

> [T]he amendment is intended solely to strengthen the remedies available to prevent the importation of merchandise bearing [a counterfeit] mark and to require the obliteration of the counterfeit trademark where feasible in all cases before disposition of the merchandise by the Customs Service.

H.R.Rep. No. 1517, 95th Cong. 2d Sess. 17, *reprinted in* 1978 U.S.Code Cong. & Ad. News 2249, 2259.

■ As even the importer in this case is forced to concede, these references demonstrate that § 1526(e) "represents a specific effort by Congress to stiffen the penalties for and to deter the use of infringing marks which amount to 'counterfeits'." In our view, these related purposes will best be furthered by adopting the "average purchaser" test applied by Judge Broderick below. The alternative test proposed by the government would be not nearly as strict, since an expert, aided by a loupe or a microscope, could readily discern differences between allegedly counterfeit and registered marks that would be unnoticed or even undetectable by the average purchaser. Indeed, one of the distinguishing characteristics of an expert is his ability to see differences that the rest of us do not, and, once the expert sees a difference between the imported object and the registered mark it is unlikely he could find them to be "substantially indistinguishable".

Consequently, the "expert" test would tend to frustrate the central purpose underlying the amendment: to provide an "effective sanction" against merchandise which "simulates or copies a registered trademark." S.Rep. No. 778, *supra.* In the absence of any more explicit congressional guidance, we believe that the proper course is to adopt the test that ensures the efficacy of the sanction added by the amendment. While it is true that forfeiture of merchandise is a severe penalty, Congress clearly intended such severity to be inflicted upon counterfeiters.

Customs argues that determining from the perspective of an average purchaser both whether an allegedly offending mark constitutes an infringement and whether it constitutes a counterfeit will "utterly [destroy] the distinction carefully drawn by the statute." We disagree. Incorporating the average purchaser test into both tiers of the statutory scheme will only require that the two very different statutory standards be applied from the same standpoint.

We recognize that in a case like the one at bar, the difference between these two standards may be more theoretical than real, *i.e.,* the challenged mark, when viewed from the perspective of the average purchaser, would not be "likely to cause confusion" unless it was "substantially indistinguishable" from the registered mark. But this will not always be so. We are aware of at least three Customs rulings in which different results would likely follow under the two standards.

For example, in *In re Louis Vuitton,* (C.S.D. 80–97, August 31, 1979), both the legitimate and the bogus merchandise bore marks comprised of two capital letters superimposed one upon the other, surrounded by a fleur-de-lis pattern. Customs ruled that the use of a superimposed "P" rather than an "L" over a "V" created a substantial likelihood of customer confusion. However, it is doubtful that the average purchaser would have viewed these marks as substantially indistinguishable.

The same is true of *In re Amazonas,* (C.S.D. 80–39, July 17, 1979). At issue

there was the use of the name "Amazonas" as opposed to "Amazon" on shoe heels and soles. While Customs found that these two marks were similar enough to cause confusion, it could not be seriously contended that the average consumer would have found them substantially indistinguishable.

Similarly, in *In re Bulova Watch Co.,* (C.S.D. 80–77, 14 Cus.Bull. No. 30, July 23, 1980), which involved the use of the name "Bolivia" as opposed to "Bulova", Customs found an infringement. Once again, however, it is unlikely that an average purchaser would have found the marks on the two watches to be substantially indistinguishable.

These cases demonstrate that Judge Broderick's interpretation of the statutory scheme does retain the distinction that Congress created. While the two standards may converge in certain applications, that possibility is hardly a sufficient justification for construing § 1526(e) in a manner that would undermine its principal objective of severely punishing counterfeiting activities.

B. *The Registered Mark as It Appears on Actual Merchandise or as It Appears on the Registration Certificate?*

■ Customs next argues that Judge Broderick misconstrued the statutory scheme by comparing the designs on the Grand Jewels bracelets with the Rolex crown as it appears on actual merchandise. Customs emphasizes that § 1526(e) requires it to protect only a "registered" mark and contends that Rolex must bear the risk of deviating from that mark. Further, Customs submits that Judge Broderick's interpretation of § 1526(e) would create additional administrative burdens which Congress deliberately declined to impose upon Customs when it required in § 1526(e) that Customs contact the trademark holder only after it determined that a counterfeit mark had been used.

We are not persuaded by these arguments. To begin with, the "deviation" that serves as the factual predicate for Customs' position is slight and inconsequential. Whenever a two-dimensional paper facsimi-le of a mark like the Rolex crown is compared with the three-dimensional mark fabricated on actual merchandise, some differences will be detectable. To allow such differences to undercut the protection Congress intended to grant the trademark owner would be absurd. *Cf. Ilco Corp. v. Ideal Security Hardware Corp.,* 527 F.2d 1221 (C.C.P.A.1976) (a mark may be modified in such a fashion as to retain its trademark impact and symbolize a single and continuing commercial impression; a change which does not alter the distinctive characteristics of a mark represents a continuity of trademark rights).

Furthermore, the narrow construction of § 1526(e) urged by Customs is inconsistent with the commercial realities of the counterfeit trademark trade. It seems safe to assume that counterfeiters copy actual merchandise, not registration certificates. In this case, for example, the designs on the Grand Jewels bracelets more closely resemble the Rolex mark as it appears on actual merchandise than they do the registered Rolex mark. Thus, just as the protected mark on actual merchandise is unlikely to be identical with the two-dimensional facsimile of the mark recorded on the registration certificate, so, too, an infringing mark would be unlikely to be substantially indistinguishable from that facsimile. As a result, if Customs' exclusive focus on the registered mark were to prevail, infringing merchandise with three-dimensional marks could rarely, if ever, be deemed counterfeit. Given the punitive and deterrent purposes underlying § 1526(e), we cannot acquiesce in so narrow an interpretation.

Nor do we see much merit to Customs' concern with the administrative burdens that Judge Broderick's interpretation of the statute would impose. If Customs' experience in this case is any indication, there will be no problem at all obtaining samples of the trademark owner's actual merchandise for purposes of comparison. We see no reason why a trademark owner would not eagerly cooperate with Customs in this regard, and even if the owner failed to do so after receiving notice of the seizure, Customs could still make its determination based on the mark as registered.

*C. "Counterfeit" or "Colorable Imitation"?*

Applying the standards we have indicated are appropriate, we have little difficulty concluding that Judge Broderick properly determined that the Grand Jewels bracelets were counterfeits. We examined the actual bracelets at oral argument and found the Grand Jewels samples to be the spitting image of the Rolex merchandise. An average purchaser would surely find the real and fake bracelets to be substantially indistinguishable. We do not understand the government to have argued otherwise on appeal.

*V. Conclusion*

For all these reasons we must conclude that Customs' interpretation and application of § 1526(e) in this case was "arbitrary, capricious, and otherwise not in accordance with law" under 5 U.S.C. § 706(2)(A). We are, of course, sensitive to

> the deference to be given an agency administering a statute, particularly "when the administrative practice at stake 'involves a contemporaneous construction of a statute by [those] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.'"

*Connecticut Fund for the Environment v. EPA,* 672 F.2d 998, 1010 (2d Cir.1982) (quoting *Power Reactor Development Co. v. International Union of Electrical, Radio & Machine Workers,* 367 U.S. 396, 408, 81 S.Ct. 1529, 1535, 6 L.Ed.2d 924 (1961)). That deference, however, is unwarranted when the administering agency's interpretation would cripple a statutory scheme in its inception. Customs' position in this case, if accepted, would have just that effect. Its standing argument would preclude an aggrieved trademark owner from seeking judicial review at all. And its substantive claims would minimize the chances of any merchandise being declared counterfeit.

We hold that Rolex had standing and the district court had jurisdiction to review Customs' final determination that the crown on the accused bracelets was not a "counterfeit". We further hold that Judge Broderick correctly interpreted § 1526(e) to require in this case (1) that the "counterfeit" question be determined by comparing the accused mark on the imported bracelets with the protected mark on Rolex's own merchandise, and (2) that the comparison be made from the perspective of an average purchaser rather than an expert. Finally, we hold that Judge Broderick properly determined that the Grand Jewels bracelets were counterfeits under § 1526(e).

Affirmed.