70 F.3d 1272
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Joseph PASKVAN, Plaintiff-Appellee,
v.
CITY OF CLEVELAND CIVIL SERVICE COMMISSION; Mitchell Brown,
individually and officially as City of Cleveland Director of
Public Safety; and Howard Rudolph, individually and
officially as City of Cleveland Chief of Police,
Defendants-Appellants.
 No. 94-3593.
 United States Court of Appeals, Sixth Circuit.
 Nov. 21, 1995.
 
 Before: CONTIE, RYAN, and SUHRHEINRICH, Circuit Judges.
 RYAN, Circuit Judge.
 
 
 1
 In this 42 U.S.C. Sec. 1983 action, the jury returned a verdict for the plaintiff, Joseph Paskvan, finding that the defendants violated his Fourteenth Amendment right to equal protection by denying him a promotion on the basis of his race. The defendants, the Cleveland Civil Service Commission, Mitchell Brown in his individual and official capacities, and Howard Rudolph in his individual and official capacities, appeal from the district court's denial of their motions for judgment as a matter of law and, in the alternative, for a new trial. On appeal, the defendants argue that insufficient evidence supported the verdict, that the district court erroneously admitted certain evidence proffered by the plaintiff, and that the district court erroneously instructed the jury.
 
 
 2
 We affirm the judgment as to Rudolph and Brown in their individual and official capacities, but reverse the judgment as to the Civil Service Commission.
 
 I.
 
 3
 Joseph Paskvan has served as a Cleveland, Ohio police officer since 1973. From around 1976 to 1985, Paskvan, while in the line of duty, was involved in nine shootings of minority persons. The police department found Paskvan justified in each shooting and criminal charges were never brought against him. The last two shootings are particularly relevant to this litigation.
 
 
 4
 On July 23, 1982, Paskvan shot and killed Michael Woods. Paskvan testified that the shooting occurred while he was driving to a police union meeting. Woods was in a vehicle that was traveling in the lane next to Paskvan's vehicle. Woods pointed a gun at Paskvan who picked up a 9-mm. handgun and shot Woods. Howard Rudolph, then the lieutenant in charge of the homicide unit (but later destined to become chief of police), investigated the shooting. Rudolph found that Paskvan committed no crime. At trial, however, Rudolph testified that the plaintiff exercised poor judgment. According to Rudolph's investigation, Woods's vehicle was traveling so fast at the time of the shooting that Paskvan could have avoided Woods by simply slowing down and driving away. However, Rudolph conceded at trial that, at the end of the investigation in 1982, he found that Paskvan had not violated any department regulation.[1]
 
 
 5
 On April 10, 1985, Paskvan shot and killed Marcos Luciano. That day, Paskvan and his partner discovered a stolen vehicle on a city street. The officers called for a patrol car. As the patrol car approached, so did Luciano, who was armed. Paskvan ordered Luciano to drop his gun, but when Luciano pointed the gun at one of the patrol officers, Paskvan fired. As it turned out, Luciano was actually carrying a BB gun. Again, then-Lieutenant Rudolph investigated the shooting and concluded that the plaintiff neither committed a crime nor violated a regulation. At trial, however, Rudolph criticized Paskvan's judgment, declaring that "he shot him, I believe, a little prematurely."
 
 
 6
 After the Luciano shooting, department procedure called for Paskvan to be assigned to the police gym for ninety days in order to "relieve stress." However, after ninety days had passed, Paskvan was still assigned to the gym, where he remained for nineteen months. The plaintiff attributes his extended assignment to the gym to several events. First, on April 11, 1985, Cleveland City Councilman John Barnes, the Chairman of the Council's Public Safety Committee, sent a letter to then-Chief of Police William Hanton requesting the plaintiff's removal from street duty, claiming that many citizens were concerned with Paskvan's involvement in "eight questionable shootings." The councilman alleged, "The last time a man was shot was because he drew a 'squeegee.' This time a man brandished a bee-bee gun.... Paskvan acquired a reputation as a[n] 'Exterminator.' "
 
 
 7
 Next, a month after the shooting several citizen groups held a march and demonstration to protest the Woods and Luciano shootings. The protesters' publicity flyer targeted Paskvan and proclaimed in part:
 
 
 8
 DON'T MISS THIS CHANCE TO JOIN THIS GIANT DEMONSTRATION AGAINST THESE OUTRAGEOUS KILLINGS OF LUCIANO JR., AND WOODS, two minority young men that did not deserve to die the way they did at the hands of a police officer who has no respect for human life.
 
 
 9
 (Capitalization in original.) The demonstration's sponsors included three organizations Councilman Barnes identified as "primarily minority groups."
 
 
 10
 The plaintiff introduced into evidence another flyer, but it is not entirely clear when this flyer was distributed or if it was. This flyer urged voters to "Vote Yes on Issue 3." The flyer showed a sketch drawing of a police officer shooting a handcuffed person in the head, warning "You may be next!" (Emphasis in original.) Some text in the center of the flyer appeared to quote some unnamed source, perhaps a referendum: "The murder of Michael Anthony Woods is of concern to all citizens, and has many ramifications, racially and politically. Police actions in this case have proven divisive in this city, and police attitudes have been high-handed and again, divisive." Some of the same groups that issued the May 1985 flyer issued the "Issue 3" flyer.
 
 
 11
 In April 1986, Rudolph became chief of police, and he decided to continue Paskvan's assignment to the gym. Rudolph also denied Paskvan's request for "secondary employment," that is, private security-type work performed by officers to supplement their income. Paskvan sought the help of the police union in order to obtain release from the gym assignment and in gaining secondary employment permission. The collective bargaining agreement between the City of Cleveland and the police union called for arbitration of such an issue, and on May 22, 1986, the arbitrator held that the police department must either state a reason for permanently assigning Paskvan to the gym, or reassign him to his former unit (the Auto Theft Unit). The arbitrator added that the "reason provided by the City cannot be arbitrary, discriminatory or unreasonable."
 
 
 12
 In early June 1986, the City claimed that Paskvan's " 'permanent assignment to the Training Academy Gymnasium allows the facility to extend its hours of operation and remain open and available ... on a regular basis.' " Paskvan returned to the arbitrator. On September 12, 1986, the arbitrator held that the City's stated reason was "arbitrary, discriminatory or unreasonable" because the City had singled out Paskvan to monitor the gym when in fact no monitor was needed at all. Although the arbitrator mentioned the City's "discriminatory attitude towards" Paskvan, nowhere did the arbitral decision mention race. The arbitrator ordered the City to transfer Paskvan out of the gym.
 
 
 13
 A month after the arbitrator's decision, the plaintiff was transferred back to the Auto Theft Unit. But Chief Rudolph attached a condition to the transfer. In an October 3, 1986 memorandum to Paskvan's supervisors, Rudolph ordered, "Under no circumstances is [Paskvan] to be instructed to perform or be permitted to engage in any activity which would allow him to work outside the Police Headquarters Building." Despite the memorandum, Paskvan's supervisors recommended approval of his repeated requests to engage in secondary employment. Chief Rudolph disapproved each request. Paskvan took the issue to arbitration and on November 28, 1988, won again. After describing the shootings, the arbitrator characterized the City's proffered reasons for disapproving secondary employment--fear of another shooting and adverse reaction by citizen groups--as "arbitrary, discriminatory and unreasonable." Again, the arbitral decision never expressly mentioned that the City or Chief Rudolph acted with a racially discriminatory purpose.
 
 
 14
 While trying to win approval for secondary employment, Paskvan was also trying to become a sergeant. In June 1987, Paskvan took the exam for promotion to police sergeant. In November 1987, the Civil Service Commission generated a promotion list that ranked the officers according to a combination of their exam score and seniority points. Out of more than one hundred officers, Paskvan ranked third. In 1988, Mitchell Brown, the Director of Public Safety, decided that the budget allowed for sergeant promotions. Although he consulted with the chief of police, Brown wielded the sole authority to promote police officers. The Civil Service Commission certified the November 1987 eligibility list and provided it to Brown. Under the "rule of three," Brown could fill each position with the three top-ranked individuals for that position. In September 1988, Brown promoted the eighteen top-ranked officers--except for Paskvan. Over time, the November 1987 eligibility list was used to promote 49 officers to sergeant--those ranked 1 to 50--but not Paskvan.
 
 
 15
 Brown testified that the community controversy over the shootings was "one of the reasons" and "an important factor" for denying Paskvan the promotion. At trial, the only other reason articulated by Brown was the chief's recommendation that Paskvan "wasn't supervisory material." Chief Rudolph testified that "one of the reasons" he recommended denying the plaintiff's promotion was the "outcry by the community," including community organizations, "most" of which were "minority organizations." At trial, Rudolph asserted two other reasons: (1) Paskvan exercised "poor judgment" in the Woods and Luciano shootings; and (2) after transferring back to the Auto Theft Unit, Paskvan engaged in behavior and made comments that resulted in disciplinary charges. No testimony explained the allegedly improper behavior and comments.
 
 
 16
 Paskvan brought this action on November 22, 1989. After this court affirmed dismissal of the plaintiff's substantive due process claims, the parties tried the procedural due process and equal protection claims in April 1993. The first jury found for the defendants on the procedural due process claim, but could not agree on a verdict for the equal protection claim. In March 1994, the parties retried the equal protection claim. This time, the jury returned a verdict for the plaintiff and awarded damages.
 
 II.
 A.
 
 17
 We review a motion for judgment as a matter of law under the same standard used by the district court. Marsh v. Arn, 937 F.2d 1056, 1060 (6th Cir.1991). We view the evidence in the light most favorable to the nonmoving party, and give that party the benefit of all reasonable inferences. Id.
 
 B.
 
 18
 The Equal Protection Clause of the Fourteenth Amendment declares that no state shall "deny to any person within its jurisdiction the equal protection of the laws." State legislation or other official action that classify groups does not generally run afoul of the right to equal protection where "the classification ... is rationally related to a legitimate state interest." City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 440 (1985).
 
 
 19
 There are two ways, however, by which government action implicating race can violate the right to equal protection.
 
 
 20
 Certain classifications ... in themselves supply a reason to infer antipathy. Race is the paradigm. A racial classification, regardless of purported motivation, is presumptively invalid and can be upheld only upon an extraordinary justification. This rule applies as well to a classification that is ostensibly neutral but is an obvious pretext for racial discrimination. But ... even if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose.
 
 
 21
 Personnel Admin. of Mass. v. Feeney, 442 U.S. 256, 272 (1979) (citations omitted) (emphases and brackets added). In proving the latter form of unconstitutional discrimination, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 265 (1977). Discriminatory purpose "implies more than intent as volition or intent as awareness of consequences." Feeney, 442 U.S. at 279. Rather,
 
 
 22
 [i]t implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group.
 
 
 23
 Id.
 
 
 24
 A plaintiff need not prove that the challenged action was motivated "solely" or "primar[ily]" by a racially discriminatory purpose. Arlington Heights, 429 U.S. at 265. Rather, once the plaintiff proves that the challenged decision was "motivated in part by a racially discriminatory purpose," the burden--presumably the burden of production--shifts to the defendant to "establish[ ] that the same decision would have resulted even had the impermissible purpose not been considered." Id. at 271 n. 21; Wesley v. Collins, 791 F.2d 1255, 1262 (6th Cir.1986). Both the plaintiff and defendant's burdens of proof must be carried by a preponderance of the evidence. Wesley, 791 F.2d at 1262.
 
 
 25
 "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Arlington Heights, 429 U.S. at 266. Evidentiary sources might include the disproportionate adverse impact on one race, the "historical background of the decision," the "specific sequence of events leading up to the challenged decision," departures from procedural or substantive norms, legislative or administrative history, and contemporary statements by decisionmakers. Id. at 266-68.
 
 
 26
 We conclude that a reasonable trier of fact could find that Rudolph and Brown, individually and as the city's policymakers in their official capacities, acted with discriminatory purpose in choosing not to promote Paskvan. First, the jury justifiably disbelieved Rudolph's other proffered reasons for denying the promotion. As for poor judgment, Rudolph himself cleared Paskvan of criminal wrongdoing in the shootings, and admitted at trial that Paskvan's conduct did not warrant internal disciplinary charges. As for poor leadership, we can find no testimony in which Rudolph supports this assertion with facts. Indeed, Paskvan's supervisor in the Auto Theft Unit, Sergeant George Sherwood, testified that Paskvan is in charge when Sherwood is absent and that Paskvan could perform a sergeant's duties "very well." Because the jury could reject Rudolph's claim that he relied on those reasons, we focus on whether the defendants acted with racially discriminatory purpose in reacting to the public outcry.
 
 
 27
 We think the jury could reasonably infer from the evidence that, because he is white, Paskvan was offered as the sacrificial lamb to appease the protesting minority organizations. After the Luciano shooting in April 1985, groups representing minority interests accused Paskvan of being a murderer. It is reasonable to infer that the "heat" generated by these organizations led Rudolph to continue Paskvan's gym assignment until the arbitrator ordered Paskvan's return to the Auto Theft Unit in October 1986. Although Rudolph had cleared Paskvan in the shootings, he nevertheless restricted Paskvan to off-street duty. Even through September 1988, the flame from the protests still burned in Rudolph and Brown's memories; they admitted that the organizations' outcry was an important factor in denying the promotion. The jury could reasonably infer that Rudolph and Brown refused to promote Paskvan, in part, because he is white.
 
 
 28
 It is also reasonable to find that Rudolph would have recommended promotion and Brown would have promoted the plaintiff had they not taken the plaintiff's race into consideration. From the November 1987 eligibility list, promotions were made in rank order from 1 through 50--except Paskvan. The jury rejected poor judgment and poor leadership as credible reasons to deny the promotion; accordingly, the jury could find that Rudolph and Brown would not have made the same decision had Paskvan's race not been a motivating factor. The jury's verdict was not against the clear weight of the evidence so as to warrant a new trial.
 
 
 29
 The defendants place great importance upon the plaintiff's failure to prove the facts comprising a prima facie case under McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). But the McDonnell-Douglas framework is just that; a framework, or a "procedural device, designed only to establish an order of proof and production," Saint Mary's Honor Center v. Hicks, 113 S.Ct. 2742, 2755 (1993), created as a means for proving discrimination where direct evidence of discriminatory intent is difficult to obtain, see Trans-World Airlines v. Thurston, 469 U.S. 111, 121 (1985).
 
 
 30
 There will seldom be "eyewitness" testimony as to the employer's mental processes. But none of this means that trial courts or reviewing courts should treat discrimination differently from other ultimate questions of fact. Nor should they make their inquiry even more difficult by applying legal rules which were devised to govern "the basic allocation of burdens and order of presentation of proof" in deciding this ultimate question.
 
 
 31
 United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 716 (1983) (citation omitted) (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252 (1981)) (quoted by Hicks, 113 S.Ct. at 2756). The evidentiary sources of the kind described in Arlington Heights can prove the ultimate question of discrimination vel non; there is no requirement that the plaintiff resort to the McDonnell-Douglas prima facie framework.
 
 
 32
 Finally, we note that no evidence supports a finding that the Civil Service Commission in any way discriminated against the plaintiff. As far as the record shows, the Civil Service Commission did not more than certify the November 1987 eligibility list to Brown for his use. We reverse the jury verdict as to this defendant. We affirm the jury verdict as to Brown and Rudolph in their individual and official capacities.
 
 III.
 A.
 
 33
 The defendants contend that the district court should not have admitted into evidence the three arbitration decisions rendered against the City. According to the defendants, the arbitration decisions contained statements expressing factual findings and conclusions that usurped the jury's role as fact finder.
 
 
 34
 Without deciding whether the admission of the evidence was error, we conclude that any error was harmless. The plaintiff made few references to the arbitral decisions and hardly mentioned the text of the decisions. The three decisions never discussed discrimination against Paskvan based on his race. The primary evidence focused on the public outcry and the reasons for denying the promotion. The text of the decisions did not substantially sway the verdict.
 
 B.
 
 35
 The defendants argue that the district court erroneously permitted the plaintiff to present the testimony of an expert witness who was unqualified and who was not identified as an expert on the witness list. Paskvan called FBI Agent Robert Connole as an expert witness to rebut Rudolph's contention that Paskvan exercised poor judgment in the shootings.
 
 
 36
 We conclude that this assignment of error is meritless. The district court did not err in holding that Connole is an expert in the area of police judgment in confrontations with armed suspects. The agent testified that he teaches defensive tactics at police academies, including instruction on how to react in confrontations with armed suspects. Also, the district court did not commit plain error by failing to grant a continuance to abate any "unfair surprise"; the defendants failed to ask for a continuance and instead tried to cross-examine Connole.
 
 C.
 
 37
 The district court provided the following jury instructions on the intentional discrimination element of the claim:
 
 
 38
 The Plaintiff alleges that the Defendants used this [promotion] provision as a pretext to discriminate against him by not promoting him. He contends that he was treated differently because he is white and that he would have been promoted if he were a minority officer who had shot two persons regardless of their race.
 
 
 39
 Under the law, the equal protection clause of the 14th Amendment prohibits racially discriminatory application of a provision by the Government to a right to a promotion.
 
 
 40
 This is because an employee has the constitutionally protected right to be treated equally under the law by his or her Government. The Plaintiff must establish by a preponderance of the evidence that the City applied its promotional scheme to him with racially discriminatory intent and purpose.
 
 
 41
 The defendants argue that the first paragraph suggests the existence of a similarly situated minority officer who shot two persons but was not denied a promotion. The defendants contend that the second paragraph suggests that the plaintiff had a substantive "right to a promotion."
 
 
 42
 "Jury instructions are reviewed as a whole to determine whether they adequately inform the jury of relevant considerations and provide a basis in law for the jury to reach its decision. A judgment may be reversed only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." Beard v. Norwegian Caribbean Lines, 900 F.2d 71, 72-73 (6th Cir.1990) (citation omitted).
 
 
 43
 We conclude that the jury instructions, although imperfect, were sufficiently accurate. The first paragraph simply states that the defendants violated the plaintiff's equal protection rights if they would have promoted an officer of another race; in other words, the defendants violated equal protection if they denied the plaintiff's promotion because of his race. The instruction does not direct the jury to find that there was a similarly situated officer.
 
 
 44
 It is true that, read in isolation, the second paragraph of the challenged instruction does seem to suggest that the plaintiff had a right to promotion, when in fact the director of safety could exercise discretion in promotions. However, when read in context, the instructions as a whole direct the jury to determine whether the defendants had a racially discriminatory purpose in applying the "promotional scheme." Later instructions also emphasized that "[t]he mere fact that the Plaintiff is white and was not promoted is not sufficient in and of itself to establish his claim," and that the jury must find that the City acted with a discriminatory purpose when it "exercised its discretion." It was undisputed that Director Brown had some discretion in promoting officers, and it is unlikely that the subtle reference to a right to promotion misled the jury to believe that Paskvan was absolutely entitled to a promotion.
 
 D.
 
 45
 The defendants contend that the district court failed to require the jury to find that the plaintiff had proven a prima facie case under McDonnell-Douglas. As already discussed, there exists no requirement that a plaintiff resort to the McDonnell-Douglas framework in order to prove discriminatory purpose.
 
 IV.
 
 46
 We AFFIRM the judgment as to Rudolph and Brown in their individual and official capacities, but REVERSE the judgment as to the Civil Service Commission.
 
 
 
 [1]
 Actually, Paskvan was suspended for five days for using an unauthorized weapon, the 9-mm. gun