# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #49

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinion(s) handed down on the 19th day of November, 2019, are as follows:

**BY WEIMER, J.:**

*2019-KA-00568*
*c/w*
*2019-KA-00569*

*STATE OF LOUISIANA VS. VALENTINO ROMAN HODGE (Parish of Sabine)*

This case is before the court on direct appeal from a district court ruling declaring unconstitutional the jury verdict regime found in La. Const. art. I, § 17 and La. C.Cr.P. art. 782, which allow for verdicts on a vote of ten of twelve jurors for felonies committed before January 1, 2019. The district court committed the following two interrelated errors: (i) creating, on that court's own initiative (*sua sponte*), a constitutional challenge to statutory law and to provisions of the Louisiana Constitution and (ii) striking down the jury verdict regime as unconstitutional on the basis of an earlier, nonbinding district court holding. Based on these errors, this court vacates the district court's ruling and remands for further proceedings.

VACATED AND REMANDED.

Chief Judge Susan M. Chehardy of the Court of Appeal, Fifth Circuit, appointed as Justice pro tempore, sitting for the vacancy in the First District.

Retired Judge James Boddie appointed Justice ad hoc, sitting for Clark, J.

Johnson, C.J., dissents and assigns reasons.

# SUPREME COURT OF LOUISIANA

### NO. 2019-KA-0568 c/w 2019-KA-0569

### STATE OF LOUISIANA

### VERSUS

### VALENTINO RAMON HODGE

*ON APPEAL FROM THE 11ᵀᴴ JUDICIAL DISTRICT COURT,*
*PARISH OF SABINE*

**WEIMER**, Justice.[1]

This case is before the court on direct appeal from a district court ruling declaring unconstitutional the jury verdict regime found in La. Const. art. I, § 17 and La. C.Cr.P. art. 782, which allow for verdicts on a vote of ten of twelve jurors for felonies committed before January 1, 2019. The district court committed the following two interrelated errors: (i) creating, on that court's own initiative (*sua sponte*), a constitutional challenge to statutory law and to provisions of the Louisiana Constitution and (ii) striking down the jury verdict regime as unconstitutional on the basis of an earlier, nonbinding district court holding. Based on these errors, this court vacates the district court's ruling and remands for further proceedings.

## BACKGROUND AND PROCEDURAL HISTORY

---

[1] Chief Judge Susan M. Chehardy of the Court of Appeal, Fifth Circuit, assigned as Justice *pro tempore*, sitting for the vacancy in the First District; Retired Judge James Boddie Jr., appointed Justice *ad hoc*, sitting for Justice Clark.

By separate bills of information, the defendant was charged with one count of domestic abuse battery by strangulation in the presence of a minor in violation of La. R.S. 14:35.3(B)(7),(I) and with one count of possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1. These alleged felony crimes both occurred on December 5, 2016.

The defendant pleaded not guilty, and the charges were slated for a jury trial.[2] Owing in large measure to the defendant's vacillation between being represented by appointed counsel and seeking retained counsel, the trial date was continued several times.

On January 24, 2019, the state filed a motion *in limine* seeking to have the district court declare that the defendant would be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict. The next day, without a hearing, the district court signed an order denying the state's motion *in limine* and declaring that the defendant is entitled to a unanimous jury verdict pursuant to the district court's own earlier ruling in **State v. Melvin Cartez Maxie**, 11th Judicial District Court, No. 13-CR-72522, rendered on October 11, 2018.

In **Maxie**, decided by the same judge, the district court ruled that the nonunanimous jury regime ran afoul of the federal constitution's Equal Protection Clause. The state appealed, but before the record was lodged in this court, the state dismissed the appeal, apparently to once again vest the district court with jurisdiction, based on Mr. Maxie's intent to submit a guilty plea.[3]

---

[2] The charges were given separate, consecutive docket numbers in the district court. Although apparently not formally consolidated, the cases proceeded simultaneously with pleadings and rulings bearing both docket numbers. Similarly, the cases have been given separate docket numbers in this court; but for grammatical simplicity, this opinion will refer to these two matters as a single case, and this court's analysis and determination apply to both district court cases.

[3] Notably, any continued efficacy of the holding of unconstitutionality in **Maxie** would create its own challenges because that ruling was appealed, but the defendant subsequently entered into a plea

2

The state appealed the instant case, urging that this court has jurisdiction over the district court's declaration of a statute's unconstitutionality. See La. Const. art. V, § 5(D), quoted *infra*.

**DISCUSSION**

As a preliminary matter, this court is called on to evaluate the very nature of the district court's ruling because the state and the defendant differ on its purported effect. The state argues the ruling is a declaration of unconstitutionality, which in straightforward fashion renders the ruling susceptible of a direct appeal to this court. The defendant argues the ruling is confined to denying the state's motion *in limine* and indicating the defendant is entitled to a unanimous jury verdict for adjudicating his potential guilt. The after effect of the defendant's argument is that a direct appeal to this court is unavailable; any appeal by the state must be taken to the intermediate court of appeal. The defendant acknowledges, however, that even if a direct appeal to this court is disallowed, this court has discretion to convert the state's appeal to a review under this court's supervisory jurisdiction.

The position of the state is correct. The district court's ruling places its prior decision in **Maxie** as the ultimate authority on the number of jurors required for a guilty verdict,[4] notwithstanding that La. Const. art. I, § 17[5] and La. C.Cr.P. art.

_____

bargain. One could reasonably question whether the defendant's plea vitiated any claim of unconstitutionality of the nonunanimous jury regime. However, given the ruling in this matter, which largely turns on this court's constitutional authority to serve as the final authority on declarations of unconstitutionality, it is unnecessary to unravel the Gordian knot of procedural complexity in **Maxie**.

[4] The district court's ruling recites that "the Defendant is entitled to a unanimous jury verdict pursuant to this Court's judgment in **State v. Melvin Cartez Maxie**, Docket No. 13-CR-72522, decided and filed on October 11, 2018."

[5] In pertinent part, La. Const. art. I, § 17(A) provides:

A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case for an offense committed prior to January 1, 2019, in which the punishment is necessarily

3

782(A)[6] explicitly allow for guilty verdicts on a vote of ten of twelve jurors for felonies committed before January 1, 2019. By subordinating constitutional and statutory provisions to the district court's own ruling in **Maxie**, the district court essentially ruled Louisiana's constitutional and statutory provisions are unconstitutional in reference to the federal constitution. Dispelling any doubt, the order of appeal notably recites that the district court rendered a "decision that Article 1, § 17 of the Louisiana Constitution of 1974 and Article 782 is facially unconstitutional," and "the State's Motion for Appeal to the Louisiana Supreme Court is **GRANTED**." Thus, the state's direct appeal to this court is proper. See La. Const. art. V, § 5(D), quoted *infra*.

Having determined the district court indeed declared that La. Const. of 1974 art. I, § 17 and La. C.Cr.P. art. 782 are unconstitutional, the next step in the analysis is guided by a considerable history of Louisiana jurisprudence prohibiting courts from *sua sponte* striking down constitutional and statutory law. In **State v. Board of Supervisors, La. State Univ. & Agr. & Mechanical College**, 228 La. 951, 84 So.2d 597, 600 (1955), this court held that "all Acts of the Legislature are constitutional until declared otherwise in proceedings brought contradictorily between interested persons." More recently, this court found the principles prohibiting a court from *sua sponte* striking down statutory law also prohibit any *sua sponte* striking down

_____

confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict.

[6] In pertinent part, La. C.Cr.P. art. 782(A) provides:

A case in which punishment may be capital shall be tried by a jury of twelve jurors, all of whom must concur to render a verdict. A case for an offense committed prior to January 1, 2019, in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.

4

provisions of the state constitution, inasmuch as "[a] constitutional provision is a more basic, fundamental provision than a statutory enactment." **State v. Bazile**, 11-2201, p. 6 (La. 1/24/12), 85 So.3d 1, 4. In **Bazile**, this court explained the prohibition against a court raising a constitutional challenge *sua sponte* is rooted in the fact that "judges were charged by their judicial oaths to enforce" the laws as written. *Id.*, 11-2201 at 5, 85 So.2d at 4 (citing **Greater New Orleans Expressway Com'n v. Olivier**, 04-2147, p. 10 (La. 1/19/05), 892 So.2d 570, 577).

Inherent in the defendant's position, noted earlier, that the district court did not issue a declaration of unconstitutionality, is that the district court did not do so *sua sponte*. This court disagrees with the defendant as to the substance of the district court's ruling and further review of the procedural origins of that determination compels the conclusion that the district court's ruling was rendered *sua sponte*. While it is true that "there is no single procedure for attacking the constitutionality of a statute," this court has identified a typical three-step analysis for a challenger to carry his burden to prove unconstitutionality. **State v. Hatton**, 07-2377, p. 14 (La. 7/1/08), 985 So.2d 709, 719. "First, a party must raise the unconstitutionality in the trial court; second, the unconstitutionality of a statute must be specially pleaded; and third, the grounds outlining the basis of unconstitutionality must be particularized." *Id.* Here, it was not the defendant, but the state that raised a question about the number of jurors necessary to render a guilty verdict. The state sought recognition of the nonunanimous verdict requirement via a motion *in limine*, which, consistent with the state's present position, did not urge that the nonunanimous verdict provisions were unconstitutional.

In a more usual case, a determination that the district court erred in creating a constitutional issue where none was presented might end the analysis of the district

court's ruling. See, e.g., **Bazile**, *supra*; **Hatton**, *supra*. This is not a usual case. The substantive reason the district court gave within the ruling itself[7] for finding the nonunanimous verdict provision unconstitutional was the district court's earlier holding in **Maxie**. For his part, the defendant argues "[t]he district court was entitled and bound to rule in accordance with its own prior, undisturbed judgment in **Maxie**." This court disagrees.

**Maxie**, as noted above, was a district court ruling that the nonunanimous jury verdict was unconstitutional, pursuant to the federal constitution. The chief obstacle to applying the holding in **Maxie** to other cases is the same provision presently empowering this court to review the declaration of unconstitutionality in this case, *i.e.*, La. Const. art. V, § 5(D) ("a case shall be appealable to the supreme court if … a law or ordinance has been declared unconstitutional."). Stated simply, if the district court's **Maxie** ruling prevents the district court from reviewing the constitutionality of nonunanimous verdicts, this court will likewise be prevented from appellate review of any evidence and argument on constitutionality.[8] Such a situation would defeat the authority accorded to this court to serve as the final, statewide authority as to what laws pass constitutional muster.

---

[7] The district court's reference to the basis for its ruling of unconstitutionality within the ruling itself distinguishes this case from **Greater New Orleans Expressway Com'n v. Olivier**, 02-2795, pp. 3-4 (La. 11/18/03), 860 So.2d 22, 24. In **Olivier**, this court found it lacked direct appellate jurisdiction under La. Const. art. V, § 5(D) because only the district court's reasons for judgment, not the judgment itself, indicated that the statute at issue was unconstitutional. *Id.* The distinction here of the judgment itself declaring laws unconstitutional negates a restrictive observation made in **Olivier** that "[a]ppeals are taken from the judgment, not the written reasons for judgment." *Id.* at 3, at 24. Formal distinctions aside, it would be nonsensical for this court's observation in **Olivier** to thwart the full exploration of the very basis of this court's jurisdiction, which is constitutionally conferred in the present case.

[8] In the present case, there was no evidence or argument adduced on the constitutionality of La. Const. art. I, § 17 and La. C.Cr.P. art. 782.

In an analogous criminal case, **City of Shreveport v. Baylock**, 236 La. 133, 107 So.2d 419 (1958), this court considered whether a district court judge was bound by a prior declaration of unconstitutionality by another district court judge. Just as here, the prior declaration of unconstitutionality had not been evaluated on appeal. The defendant argued the declaration of unconstitutionality barred his prosecution under an ordinance that had been declared to be unconstitutional. This court held that the prior declaration of unconstitutionality by the district court did not bar the defendant's prosecution under that ordinance. **Id.**, 107 So.2d at 422.

In **Baylock**, this court surveyed the jurisprudence of other jurisdictions and noted a consensus of "holdings … that a definitive judgment of a tribunal that is not a court of last resort is conclusive only for the particular case decided and is not binding in future cases." **Id.** at 421. Importantly, this court also reasoned that if the prior district court judgment of unconstitutionality was binding in a later case, that would bar "this court on a review of the judgment . . . from later determining the same constitutional issue." **Id.** at 422. Although **Baylock** was decided under a previous state constitution, these rationales remain applicable today because the constitutionally-mandated jurisdictional principles then and now are substantially the same. Compare La. Const. of 1921 art. VII, § 10(2) (1958) ("Cases in which . . . a law of this state has been declared unconstitutional" are among those that "shall be appealable to the Supreme Court."), with La. Const. of 1974 art. V, § 5(D) ("a case shall be appealable to the supreme court if … a law or ordinance has been declared unconstitutional.").

At this concluding juncture, a longstanding rule–reflecting the primary role of legislation in the justice system–bears repeating: "Statutes are generally presumed to be constitutional and the party challenging the validity of the statute bears the burden

7

of proving it is unconstitutional." **Hatton**, 07-2377 at 13, 985 So.2d at 719 (citing

**State v. Fleury**, 01-0871, p. 5 (La. 10/16/01), 799 So.2d 468, 472; **State v. Brenner**,

486 So.2d 101, 103 (La. 1986); and **State v. Rones**, 223 La. 839, 67 So.2d 99, 105

(1953)). Likewise, "[a] constitutional provision begins as a legislative enactment and,

therefore, also requires enforcement by the district court." **Bazile**, 11-2201 at 6, 85

So.3d at 4 (citing La. Const. art. XIII, § 1(A) and (C)). Measured by these principles,

the district court's declaration of unconstitutionality in this case represents two

simultaneous errors: (i) creating, *sua sponte*, a constitutional challenge to statutory

and constitutional provisions and (ii) striking down those laws as unconstitutional on

the basis of an earlier, nonbinding district court ruling.

### DECREE

For the foregoing reasons, the ruling of the district court is hereby vacated and

this matter is remanded to the district court for further proceedings consistent with

this opinion.

**VACATED AND REMANDED.**

**SUPREME COURT OF LOUISIANA**

**No. 2019-KA-00568**

**STATE OF LOUISIANA**

**VS.**

**VALENTINO RAMON HODGE**

**ON APPEAL FROM THE 11TH JUDICIAL DISTRICT COURT, PARISH OF SABINE**

**JOHNSON, C.J.**, dissents and assigns reasons.

I disagree that the district court created a constitutional issue where none was presented. *Sua sponte* means "without prompting or suggestion; on its own motion." Black's Law Dictionary (11th ed. 2019). In this case, it was the state—not the court—who essentially forced the issue when it filed the motion in limine seeking an answer as to the number of jurors necessary to render a guilty verdict. As a result, the district court ruled that defendant was entitled to a unanimous jury verdict, effectively taking judicial notice of the court's previous ruling on the constitutionality issue in *State v. Maxie*, 13-CR-72522, 11th Judicial District Court, Sabine Parish (October 11, 2018). It is undeniable that the adoption of Louisiana's nonunanimous jury system, currently set forth in La. Const. art. I, § 17 and La. C.Cr. P. art. 782, was motivated by racial bias. In my view, the district court's rulings in *Maxie* and this case, finding Louisiana's nonunanimous jury scheme violates the Equal Protection Clause of the Fourteenth Amendment, are correct. Therefore, I must respectfully dissent.

Louisiana is one of only two states, with Oregon being the other, which allows split jury verdicts in felony cases. The nonunanimous jury system has undergone constitutional challenges as a violation of the Sixth Amendment. In 1972, the United States Supreme Court in *Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed. 2d 184 (1972), effectively ruled in a split decision that the Sixth Amendment requires unanimous verdicts in federal courts—but the 14th Amendment does not require unanimous verdicts in state courts. This court has relied on *Apodaca* to continue to uphold the constitutionality of

1

Louisiana's system. *See State v. Bertrand*, 08-2215 (La. 3/17/09), 6 So. 3d 738. Notably, a renewed Sixth Amendment challenge to our law is currently pending before the United States Supreme Court in *Ramos v. Louisiana*, 18-5924, 139 S.Ct. 1318, 203 L.Ed. 2d 563 (2019), wherein the Court is considering whether the Fourteenth Amendment fully incorporates the Sixth Amendment guarantee of a unanimous jury verdict in criminal cases. The issue of nonunanimous juries has gained scholarly attention and discourse because of increased public awareness regarding the racist roots of the Louisiana system. Last year Louisiana voters approved a constitutional amendment requiring unanimous jury verdicts in felony cases. The amendment applies to felony offenses committed on or after January 1, 2019. *See* La. Const. art. I, § 17. Thus, the fate of defendants such as Mr. Hodge is still in the hands of divided juries as part of a system with racist origins and discriminatory effect. In my view, it is time to hold this Jim Crow era law unconstitutional.

It is unfortunate that this court has chosen not to rule on the merits of the constitutional issue due to the majority's finding of procedural errors. The evidence underlying the district court's ruling demonstrates the law is unconstitutional as a violation of the Equal Protection Clause. In determining whether a law violates the Equal Protection Clause, the Supreme Court has held there must be proof of racially discriminatory intent or purpose in addition to a racially disproportionate impact. *See Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 50 L.Ed. 2d 450 (1977). The documented materials from Louisiana's 1898 Constitutional Convention leave no doubt that the nonunanimous jury verdict system in Louisiana was created for the invidious discriminatory purpose of minimizing or canceling out the voting power of black jurors and to deny African-Americans meaningful participation in the institution of jury service.

The provision permitting nonunanimous felony convictions was adopted during the 1898 Constitutional Convention and codified as Article 116:

> The General Assembly shall provide for the selection of competent and intelligent jurors. All cases in which the punishment may not be at hard labor shall, until otherwise provided by law, which shall not be prior to 1904, be tried by the judge without a jury. Cases in which the punishment may be at hard labor shall be tried by a jury of five, all of whom must concur to render

> a verdict; **cases in which the punishment is necessarily at hard labor, by a jury of twelve, nine of whom concurring may render a verdict**; cases in which the punishment may be capital, by a jury of twelve, all of whom must concur to render a verdict.

La. Const. art. 116 (1898) (emphasis added). This provision was approved during a convention which celebrated white supremacy. Hon. E.B. Kruttschnitt, President of the Convention, opened with the following relevant remarks:

> In the first place, my fellow-citizens, we are all aware that this convention has been called by the people of the State of Louisiana principally to deal with one question, and we know that but for the existence of that one question this assemblage would not be sitting here today. We know that this convention has been called together by the people of the State to eliminate from the electorate the mass of corrupt and illiterate voters who have during the last quarter of a century degraded our politics.
> ***
> I believe that our Northern fellow-citizens begin to feel the race sympathy stilling within their breasts. They know that the question which we are trying to solve here is one which imperils not only the integrity of the future government of the State of Louisiana and those of eight or ten other Southern States, but that we sitting here as a deliberate assembly, and the assemblies of the other Southern States, are to decide whether the presidential office is to be put up for barter and sale on account of the irresponsible character of the constituency in these Southern States. And of the venality and corruption of the delegations which they send to certain national conventions.
>
> Only a few years back, it might have been considered impolite to say what I am now saying, but there are men standing high today in the councils of the nation, who have seen the doors of the White House barred to them by the ignorant and corrupt delegations of Southern negroes, and we know that they cannot but feel a sympathy with us in our aspirations and efforts.

Official Journal of the Proceedings of the Constitutional Convention of the State of Louisiana (1898), 9-10. The purpose of the convention was further confirmed in closing remarks by Judge Thomas J. Seemes, Chairman of the Committee on the Judiciary:

> We met here to establish the supremacy of the white race, and the white race constitutes the Democratic party of this State. There is, therefore, in my judgment, no separation whatever, between the interests of the State and those of the Democratic party, and if we are to be subjected to criticism because our ordinances may have been colored with the view, in some instances, of promoting the interests of the Democratic party, as those interests are not separated from the State, I feel no hesitancy in saying that we have done no injury to the State.
> ***
> Now then, what have we done? is the question. Our mission was, in the first place, to establish the supremacy of the white race in this State to the extent to which it could be legally and constitutionally done and what has our ordinance on suffrage, the constitutional means by which we propose to maintain that ascendency, done? We have established throughout the State white manhood suffrage.

*Id.* at 374-75. Judge Seemes went on to explain the convention delegates established a poll tax, an educational test for voters, and the requirement that voters should own property. However, the new constitution also provided an exception for white men who were "grandfathered," and they would not be required to satisfy these new voter requirements as long as they registered to vote by a particular deadline. *Id.* at 375.

Moreover, Mr. Kruttschnitt again addressed the convention in closing, making clear they would have gone even further in denying and suppressing the rights of African-Americans but were limited by the United States Constitution and federal courts:

> But I say to you, as George D. Tillman said to the South Carolina convention, when the labors of that convention were criticized: We have not been free; we have not drafted the exact Constitution that we should like to have drafted; otherwise we should have inscribed in it, if I know the popular sentiment of this State, universal white manhood suffrage and the exclusion from the suffrage of every man with a trace of African blood in his veins. We could not do that, on account of the Fifteenth Amendment to the Constitution of the United States and, therefore, we did what has been so well expressed by the Supreme Court of Mississippi …within the field of permissible action, under the limitations imposed by the Federal Constitution, the convention swept the field of expedients to obstruct the exercise of suffrage by the negro race.
>
> \*\*\*
>
> The first and foremost, and most important, problem which confronted us was that of the suffrage.
>
> \*\*\*
>
> We have placed it within the power of the people of this State to have elections as fair and as pure as those in the State of Massachusetts herself; and I say to you that we can appeal to the conscience of the nation, both judicial and legislative and I don't believe that they will take the responsibility of striking down the system which we have reared in order to protect the purity of the ballot box, and to perpetuate the supremacy of the Anglo-Saxon race in Louisiana. If they do, theirs be the responsibility for bringing back the methods which have prevailed in the past- not ours. We have laid them aside. We have reared a perfectly clean structure, and we intend to have a clean electorate, if the rest of the nation will allow it, and believe that they will.
>
> Our mission was, in the first place, to establish the supremacy of the white race in this State.

*Id.* at 379-81.

This shocking landscape is plainly outlined in the official records of the 1898 Convention, and has been thoroughly explained and put into context by scholarly experts. Such expert testimony is part of the evidence underlying the district court's declaration of unconstitutionality. A review of this underlying evidence is critical to fully explain the

4

underpinnings of the establishment of the nonunanimous jury system in Louisiana. The district court's ruling was based on its own prior ruling in *State v. Maxie*, *supra*. In *Maxie*, the court conducted a full evidentiary hearing on Maxie's constitutional challenge to the nonunanimous jury scheme and issued written reasons for finding a unanimous jury verdict is constitutionally required for conviction.[1] The parties in *Maxie* stipulated to certain documents to be submitted into evidence, including a certified transcript of a Motions Hearing in the matter of *State v. Lee*, No. 500-034 & 498-666, Criminal District Court, Parish of Orleans, 2/3/17, which included testimony from expert witnesses called in that matter, namely Professor Emeritus of History Lawrence Powell of Tulane University and Professor Kim Taylor-Thompson of New York University. Additionally, the defense called three live witnesses: John Simerman of *The Advocate* newspaper, Professor Thomas Aiello, and Professor Thomas Frampton. Mr. Simerman worked with two other individuals to develop the investigative series, "Tilting the Scales," regarding the history of Louisiana's nonunanimous jury verdict system and its pernicious effects on the criminal justice system. Mr. Simerman was called to testify as to the methodology of the study and to verify and authenticate the data and conclusions as detailed in the published series. Mr. Simerman provided a detailed analysis as to the collection methods for the dataset used to calculate the impact of a non-unanimous jury verdict scheme on the Louisiana criminal justice system.

Professor Thomas Aiello, an associate professor of history and African-American studies at Valdosta State University, authored *Jim Crow's Last Stand*, a comprehensive book on the history and context of Louisiana's majority verdict system. Thomas Aiello, *Jim Crow's Last Stand–Nonunanimous Jury Verdicts in Louisiana* (Louisiana State University Press 2015). Professor Aiello was accepted by the court as an expert historian. Professor Aiello's testimony made clear that following Reconstruction, many in Louisiana became increasingly concerned about the ability of African-Americans to exercise

---

[1] Although the *Maxie* court's reasons for judgment were not made part of the record in this case, that document is included in the Joint Appendix submitted in the United States Supreme Court by the parties in *Ramos v. Louisiana*, No. 18-5924, Joint Appendix, p. 25-83; https://www.supremecourt.gov/DocketPDF/18/18-5924/102616/20190611121914120_18-5924%20Joint%20Appendix%20-%20Final.pdf; 2018 WL 8545357, *24-71.

"political and legal power." One of the key areas where African-Americans were participating, outside of voting, was in jury service because the United States Supreme Court had held in *Strauder v. West Virginia*, 100 U.S. 303 (1879), that the Fourteenth Amendment prohibited excluding residents from jury duty on the basis of race. 2018 WL 8545357, at *39. However, the white South pushed back against this and attempted to exclude minority members in every conceivable manner. 2018 WL 8545357, at *39. Professor Aiello testified the general consensus was that African-Americans did not deserve to serve on juries in Louisiana, explaining that "[w]hile the end of the Civil War did make the slaves free, it did not make them the peers of white people in Southern white minds. And if you were supposed to get a fair trial by a jury of your peers, there are a very scant few white Southerners in the Gilded Age who saw black jurors as their peers; and it was an affront to justice for white people to put black jurors in front of them to decide their fate." 2018 WL 8545357, at *40. Professor Aiello further testified the purpose of the Constitutional Convention of 1898 was clear and unequivocal, "to eliminate black political power." 2018 WL 8545357, at *44-45. The *Maxie* court stated:

> Professor Aiello testified as to the historical context surrounding the constitutional conventions of both 1898 and 1973. He provided a detailed analysis of the prevailing sentiments and feelings of the delegates at the conventions and the general societal beliefs during these periods of time. His testimony persuasively demonstrated that race was a motivating factor behind the adoption of the 1898 constitution, especially with respect to disenfranchisement of minority voters and stripping the ability of minorities to influence the judicial system. His testimony also persuasively showed that the 1973 convention was not free from racial consideration and that the delegates at the convention were keenly aware of the racial tensions when drafting the new constitution. His testimony provides the historical basis for this Court's determination that the non-unanimous jury verdict scheme in Louisiana was motivated by invidious racial discrimination.

2018 WL 8545357, at *37-38.

Professor Thomas Frampton, lecturer at Harvard University on staff as a Climenko Fellow, with a B.A. and M.A. from Yale University, *summa cum laude*, and a J.D., with highest honors, from Berkeley School of Law, was proffered and accepted by the court as an expert lawyer, with a specialty in legal history, race, and the law. Professor Frampton endorsed Professor Aiello's testimony and concurred with his conclusions and analysis. 2018 WL 8545357, at *48-49. Professor Frampton was retained as an expert to perform

an independent empirical analysis of the data collected by Mr. Simerman for *The Advocate* series. He performed his own data analysis to verify the results as presented were accurate. He also performed empirical analysis of the data according to Supreme Court precedent with respect to disparate impact and proving unconstitutional racial discrimination. 2018 WL 8545357, at *49. Based on his empirical analyses of the data, it was his expert opinion that "the non-unanimous jury verdict system operated today just as it was intended in 1898: to silence African-Americans on juries and to render their jury service meaningless." 2018 WL 8545357, at *52. Professor Frampton explained that he performed his analysis in the context of the literature pioneered by Dr. Kim Taylor-Thompson on "empty votes." Dr. Taylor-Thompson defined "empty votes" as "those cast by the minority in a super-majority regime. These votes are essentially meaningless because a majority can come to the conclusion without discussion or inclusion of the minority point of view." 2018 WL 8545357, at *50 n. 1. Dr. Frampton's data analysis revealed that "only 43 percent of empty votes are cast by white jurors. This represents a 21 percent absolute disparity, or 21 percent less than what would be expected if there were nothing else operating on the outcome. African-American votes represented 31.3 percent of overall votes cast, but represented 51.2 percent of the empty votes cast. This is an absolute disparity of 20 percent." 2018 WL 8545357, at *51. Further, given the data provided by *The Advocate*, Dr. Frampton concluded that these disparities cannot be explained from random variation in the data and that these findings are statistically significant under Supreme Court precedent in the race-discrimination context. 2018 WL 8545357, at *51-52.

Professor Frampton also examined the data with respect to the impact on defendant as opposed to juror representation. The data revealed that "African-American defendants are convicted by non-unanimous juries 43 percent of the time and that white defendants are convicted by non-unanimous juries 33 percent of the time. Comparing these rates of conviction by non-unanimous verdicts, Professor Frampton found a disparity of approximately 30 percent. That is, African-Americans are 30 percent more likely to be convicted by non-unanimous juries than white defendants. These results were statistically significant and indicated racial discrimination against African-American defendants."

2018 WL 8545357, at *52-53. Professor Frampton further opined that "jury deliberations tend to be less robust and shorter when non-unanimous verdict rules are in place. That is, once the minimum number of votes are achieved, deliberations end, regardless of the desire of the minority to continue deliberating." 2018 WL 8545357, at *53.

The evidence and expert testimony proves that the motivating factor behind the Constitutional Convention of 1898 was to establish white supremacy throughout the State of Louisiana. As noted by the *Maxie* court, "the leaders of the convention openly and on the record endorsed racial discrimination and white supremacy as the goal and the outcome of the Convention." 2018 WL 8545357, at *58. The evidence submitted in *Maxie* further proves that the *current* law is also unconstitutional as applied. Although the law has minimally changed since the 1898 Constitution, and now requires ten jurors to agree, rather than the original nine juror requirement, this change did not eliminate the discriminatory impact of non-unanimous jury verdicts. The current law is still traceable to the original system and still has discriminatory effects. *See United States v. Fordice*, 505 U.S. 717, 734, 112 S. Ct. 2727, 120 L.Ed. 2d 575 (1992). As found by the *Maxie* court, "the 1974 provision is rooted in and fairly traceable to the provisions of the 1898, 1913, and 1921 constitutions allowing for non-unanimous verdicts. It has already been conclusively established that the 1898 provision is unconstitutional under the *Arlington Heights*…jurisprudence. It is also the undisputed expert testimony of Professor Aiello that the provisions in 1913 and 1921 were reenacted without debate or comment." 2018 WL 8545357, at *62. The court further cited Professor Aiello's testimony that the final outcome of the 1973 Constitutional Convention was to compromise and keep the unanimity requirement only as to capital cases and to increase the rule to 10-to-2. The 1973 Convention wanted to decrease, but not eliminate, the discriminatory impact of non-unanimous jury verdicts. Both Mr. Simerman and Professor Frampton testified regarding the disparate impact on African-Americans that stem from the *current* non-unanimous verdict rule, and both indicated that the empirical analyses they conducted showed statistically significant results that demonstrate disparate impacts. 2018 WL 8545357, at *63.

8

In written reasons for judgment, the *Maxie* court detailed the unopposed and unchallenged evidence produced at the hearing and concluded:

> The evidence, unopposed and unchallenged by the State establishes the following: 1) The original 1898 enactment was motivated by invidious racial discrimination; 2) The enactment of 1973 perpetuates the disparate impact of the 1898 provision; 3) The delegates at the Convention of 1973 did not cleanse the racial motivation from 1898; 4) The delegates at the Convention of 1973 at the very least tacitly acknowledged the discriminatory impact of the 1898 provision and merely attempted to ameliorate, but not cure, this disparate impact; 5) The current provision perpetuates invidious racial discrimination; and 6) The current non-unanimous jury verdict scheme disparately affects African-American jurors by negating their jury service and disparately affecting African-American defendants by overwhelmingly convicting them by non-unanimous juries.

2018 WL 8545357, at *71. This evidence compels a finding that Louisiana's non-unanimous jury scheme violates the Equal Protection Clause of the Fourteenth Amendment.

Although the majority of this court does not decide the constitutional issue today, we should not ignore the shameful history surrounding our system, nor shy away from forcing its end. "The history of nonunanimous criminal jury verdicts acts as its own advocate for ending the practice." Aiello, *supra*, at p. xi.

9